Richard COX *v.* STATE of Arkansas

CR 00-345 47 S.W.3d 244

Supreme Court of Arkansas
Opinion delivered June 28, 2001

*Etoch Law Firm,* by: *Louis A. Etoch,* for appellant.

*Mark Pryor,* Att'y Gen., by: *David R. Raupp, Sr.* Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. The appellant, Richard Cox, was tried and convicted of capital murder resulting from the death of Holly Strickland. He was sentenced to life in prison without the possibility of parole. He appeals and raises five points: (1) the trial court erred in not granting his motion for directed verdict at trial; (2) the trial court erred in not suppressing his custodial statement; (3) the trial court erred in excluding from evidence statements by Kingrale Collins that Collins had committed the murder; (4) the trial court erred in not declaring a mistrial after allegedly improper comments and argument by the prosecuting attorney; and (5) the trial court erred in not requiring a racially neutral reason from the prosecuting attorney when the prosecutor struck a potential African-American juror. We hold that none of the points has merit, and we affirm.

The facts of this case are taken from the statement given by Cox to Wynne police officers and from various witnesses at his trial. In the early morning hours of May 18, 1996, Kingrale Collins, who was in his twenties, and Cox, who was age sixteen at the time, went to Collins's house in Wynne and got Collins's 12 gauge pump shotgun and shotgun shells. The handle of the shotgun was taped with gray tape. Cox carried the shotgun until the two young men crossed the railroad tracks when he handed it to Collins. Cox said that Collins told him he was "going to get some money" that was owed him.

Cox and Collins first stopped at a house trailer and knocked on the door. No one answered, and they left. According to Cox, Collins then stopped at two more residences by himself, a white house and an apartment complex, and knocked on the doors, while Cox watched from a distance. Two witnesses for the State, Charlotte Archer and Greg Wilson, confirmed that they had heard knocks on their doors during this time period. Ms. Archer testified that she looked through a window and saw two young black males standing at her door. She did not answer the door. Greg Wilson testified that at about 2:00 or 3:00 a.m. he heard someone beating on his door. He went to the door, and no one was there. Later, he heard shots and went out to his porch where he saw "two guys" running down the street with a shotgun.

According to Johnny Strickland, the husband of the murder victim, he was in the bathroom having just arrived at a friend's house with his wife at around 2:30 a.m. He heard shots, ran out to the living room, and found his wife on the floor in a pool of blood in front of the door. She showed no signs of life. Dr. Stephen

Erickson, a forensic pathologist with the State Crime Lab, testified that she died from a single shotgun wound to the right arm, and right chest.

In Cox's statement to Wynne police officers, he denied going to the front door where Holly Strickland was killed but stated that he heard three shots and heard the victim scream. He admitted that his finger prints were on two of the loaded shells in the shotgun and on the trigger as well. He denied killing Holly Strickland, however, and was adamant that Collins had done it. He did admit to carrying and hiding the shotgun as he ran away from the crime scene with Collins. When asked what would have happened if the man in the trailer had opened his door, Cox answered: "I guess he would have shot him."[1] He told interrogating police officers that Collins asked him to imitate the victim's scream, and when Cox did, Collins laughed.

At about 3:00 that same morning, Antonio Milam reported information about Collins's connection to the murder to the Wynne Police Department. A search warrant was issued for Collins's house where a shotgun and shells were found. The shotgun proved to be the murder weapon used in the Strickland slaying. On May 22, 1996, Cox was arrested and interrogated by Wynne police officers. First, he answered questions implicating himself in the crime. He then signed a written statement that summarized his activity on the night of the crime. Later, he moved to suppress those statements on the basis that they were not voluntarily given and his *Miranda* rights were not knowingly and intelligently waived. The circuit court denied that motion. He was subsequently charged with capital murder, and the death penalty was requested. He was convicted of capital murder, as already indicated, and sentenced to life in prison without parole after the State waived the death penalty. Collins, in a separate trial, was convicted of capital murder and sentenced to death. We affirmed Collins's conviction and death sentence. *See Collins v. State*, 338 Ark. 1, 991 S.W.2d 541 (1999).

---

[1] Cox's abstract of the record in his brief contains the statement: "I guess *we* would have shot him." We are governed by the record which has the personal pronoun "he."

## I. Sufficiency of the Evidence

For his first point of appeal, Cox contends that the trial court erred in failing to grant his motion for directed verdict. He maintains that there was no evidence presented that he fired the fatal shots. Indeed, he points to the fact that in his statement, which the prosecutor introduced as part of the State's case-in-chief, Cox said that Collins was the murderer. In addition, he urges that there was no proof that he acted with deliberation and premeditation. On the contrary, he claims that he was merely present at the crime scene without any indication that Collins would do what he did.

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000); *Terrell v. State*, 342 Ark. 208, 27 S.W.3d 423 (2000). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Ferguson v. State, supra; Terrell v. State, supra.* Substantial evidence is evidence that is of sufficient certainty and precision that it compels a conclusion one way or another. *Ferguson v. State, supra; see also Booker v. State*, 335 Ark. 316, 984 S.W.2d 16 (1999). On appeal, this court views the evidence in the light most favorable to the State and sustains a judgment of conviction if there is substantial evidence to support it. *Ferguson v. State, supra; Terrell v. State, supra.* Double jeopardy considerations require this court to consider a challenge to the sufficiency of the evidence prior to other assignments of circuit court error. *Dixon v. State*, 327 Ark. 105, 937 S.W.2d 642 (1997); *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996).

The prosecution's theory of the case at Cox's trial was that he was an accomplice in the Strickland murder with Collins. Our Criminal Code defines an accomplice as follows:

(a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:

(1) Solicits, advises, encourages, or coerces the other person to commit it; or

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing it; or

(3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

Ark. Code Ann. § 5-2-403(a) (Repl. 1997); *see also* AMCI 2d 401. Mere presence when the crime is being committed and when one does not have a legal duty to act does not make one an accomplice. *See Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997); *Pilcher v. State*, 303 Ark. 335, 796 S.W.2d 845 (1990); *see also* AMCI 2d 404.

 We first note that the jury was instructed on the law of accomplice liability, which included an instruction on mere presence. The jury obviously concluded that Cox was an accomplice with Collins in perpetrating the crime. We believe that the jury's verdict is supported by substantial evidence. Cox's fingerprints were on two of the shells loaded into the shotgun, and his fingerprint was on the trigger. By his own admission, he accompanied Collins to the murder scene and carried the shotgun part of the way on that journey. After the murder, he fled with Collins. He carried the shotgun while fleeing and tried to hide it on his person. He also accompanied Collins to the first residence, which was a trailer. Moreover, the jury could have inferred from these facts that Cox did more in perpetrating the murder than simply assisting Collins. *See, e.g., Thomas v. State*, 330 Ark. 442, 954 S.W.2d 255 (1997). We affirm the circuit court on this point.

## II. Suppression of Statement

For his next point, Cox maintains that his statement to police officers should have been suppressed because it was not voluntarily given and because he did not knowingly and intelligently waive his *Miranda* rights.[2] We affirm the circuit court.

a. Voluntariness

First, with regard to whether Cox voluntarily admitted his participation in the crime, he underscores that he was only age sixteen at the time of the police interrogation and a ninth grade student with an I.Q. of 92. He says that he was arrested and handcuffed at about 10:00 p.m. on May 22, 1996, and that his

---

[2] In his motion to suppress before the circuit court, Cox appeared to contest the written statement prepared by Wynne police officers and signed by him as well. In his argument on appeal, the written summary is not specifically mentioned.

mother was never notified before the police interrogation. In addition, he claims that he was the victim of false promises of leniency by the interrogating police officers. As an initial matter, he claims that Officer Roger Speer of the Wynne Police Department told him that he could help himself by telling the truth and that the prosecuting attorney would want to know whether he cooperated. It was after this exchange, according to Cox, that he told his story. Furthermore, towards the end of the interrogation, Chief Lynn Rogers said to Cox that he would probably be out on bond the next day.[3] He claims that that was a false promise, and, as a result, his statement to the police officers was not only the result of coercion and intimidation but also due to deception.

 Our court has set out the standards for reviewing the voluntariness of statements resulting from police interrogation:

> We have said that statements made while in police custody are presumed to be involuntary and the burden rests on the State to prove their voluntariness and a waiver of *Miranda* rights by a preponderance of the evidence. *See Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998); *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). In determining voluntariness, this court looks to whether the statement and waiver were the result of free and deliberate choice rather than coercion, intimidation, and deception. *Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999); *Smith v. State, supra*, citing *Colorado v. Spring*, 479 U.S. 564 (1987) and *Moran v. Burbine*, 475 U.S. 412 (1986). On appeal, this court makes an independent determination of the voluntariness of a confession, but in doing so, we review the totality of the circumstances and will reverse only when the trial court's finding of voluntariness is clearly against the preponderance of the evidence. *See Jones v. State*, 323 Ark. 655, 916 S.W.2d 736 (1996); *Trull v. State*, 322 Ark. 157, 908 S.W.2d 83 (1995). We recognize in our determination of whether a trial court's finding is clearly erroneous that conflicts in testimony are for the trial court to resolve. See *Jones v. State, supra*. Where it is apparent from the record that a statement is not the product of an accused's free and rational choice and where the undisputed evidence makes clear that the accused did not want to talk to police detectives, the Supreme Court has held that due process of law requires that the resulting statement not be used against the accused. *Mincey v. Arizona*, 437 U.S. 385 (1978). Other

---

[3] At various times in the record Officer Speer is referred to as Officer Spear and Chief Rogers as Chief Rodgers.

factors mentioned in *Mincey*, in addition to the fact that the accused made repeated requests that the interrogation stop so he could retain a lawyer, were that he was weakened by pain and shock, isolated from family, friends, and legal counsel, and was barely conscious. Under these circumstances the Court held that Mincey's will was overborne and the statement could not be used against him.

*Riggs v. State*, 339 Ark. 111, 119, 3 S.W.3d 305, 309-310 (1999).

This court has also consistently held that relevant factors in determining whether a confession was involuntary are age, education, and the intelligence of the accused as well as the lack of advice as to his constitutional rights, the length of detention, the repeated and prolonged nature of questioning, and the use of mental or physical punishment. *See, e.g., Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997).

In the instant case, it is true that Cox was sixteen and had an average I.Q. He was also arrested and interrogated without notice to his mother. He, of course, was subsequently charged as an adult with capital murder pursuant to Ark. Code Ann. § 9-27-318 (Repl. 1998). Accordingly, notifying his parent was not required. *See Ray v. State*, 344 Ark. 136, 40 S.W.3d 243 (2001); *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998). Moreover, Cox's age of sixteen is not of such significance, standing alone, to invalidate the statement. *See, e.g., Miller v. State,* 338 Ark. 445, 994 S.W.2d 476 (1999); *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). These circumstances enumerated by Cox do not render his statement inadmissible, and the circuit court did not clearly err in ruling as it did.

Cox, however, goes further and specifically contends that Wynne police officers made false promises of leniency. He is correct that our blackletter law states that false promises of leniency will invalidate a confession. *See, e.g., Bisbee v. State* 341 Ark. 508, 17 S.W.3d 477 (2000); *Sanford v. State, supra; Humphrey v. State, supra; Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996). The relevant colloquy at issue between Officer Speer and Cox follows:

> SPEER: Here's what's going to happen. Now, one of the ways, you know, you can help yourself is to tell the truth. Now, this is benefitting you by telling the truth.

COX: Okay.

SPEER: Because what I'm going to do,. whenever I get to the prosecutor, he's going to say, "Well, did either one of them cooperate with you? Did either one of them want to tell you the truth about what happened?" As of right now, I've got one person that I can say, "Yes, he cooperated with me."

COX: Okay, okay, I'll tell the truth.

 Our reading of Officer Speer's comments is that he was advising Cox to tell the truth and that he would tell the prosecutor if Cox cooperated. At no point did he state that leniency would flow from Cox's telling the truth. At no point did he state that he or anyone else other than the prosecutor could mete out leniency. We conclude that Cox's proof falls short of a false promise of leniency when no promise was made by Officer Speer, and Officer Speer had no authority to make such a promise.

 Moreover, we conclude that Chief Rogers's indication that bail would be set for Cox the following day had no impact on whether Cox voluntarily made his statement. The discussion between Cox and Chief Rogers regarding bail follows:

COX: Will I be able to leave tomorrow? Or will I have to stay here until court, cause I don's want to do that?

ROGERS: Uh, we'll make arrangements for a bond to be posted for you.

COX: A bond, how much?

ROGERS: Well, that'll be up to the judge.

COX: So, like, my brother is in the army right now and he gets some money out of the bank and pays my bond, I can go home?

ROGERS: Yea, well, like I said the judge will be the one that post bond.

COX: So the bond (inaudible).

ROGERS: I don't set bond.

COX: I get the bond tomorrow. Probably?

ROGERS: Probably, ok.

COX: So can I call my brother, right now, and tell him?

ROGERS: We'll let you make a phone call as soon as you get over to the jail.

Again, Cox argues that this amounted to a false promise by Chief Rogers that he would be bonded out of jail the following day. The chief of police, however, was clear that he did not set the bonds and that the judge did. The chief does appear to agree with Cox that he would "probably" have bond set the next day. We disagree, however, that this was a promise that misled Cox or in any way induced him to continue making a statement. There is also the fact that Cox had already given his statement to Officer Speer and reiterated part of it to Chief Rogers before this colloquy regarding the bond took place. The one new fact that did develop after the bond colloquy was Cox's admission that his fingerprint was probably also on the shotgun's trigger because he put the safety on and pulled the trigger to make certain that the safety had been activated.

■ In short, we conclude that no false promise of leniency was made by Officer Speer or Chief Rogers. Thus, the circuit court did not clearly err in finding that Cox's statement was voluntary.

b. Knowing and Intelligent Waiver

■ ■ Cox further claims that his waiver of his *Miranda* rights was not knowingly and intelligently made. We need not address this point. Following the suppression hearing, the circuit court made the following ruling:

> The Court is of the opinion that the State has met its burden of proof and has satisfied the Court the statement was freely and voluntarily given. I don't find that there are any such promises that would require the denial of the use of the statement by the State. The promises by the officers were complied with. Some things may have to come out of the videotape or the statement. We will deal with that later.

At no point does the circuit court address the waiver issue, and Cox did not urge that it do so. We have held that the question of voluntariness and the question of a knowing and intelligent waiver

are separate inquiries. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). Cox, of course, was given his *Miranda* warnings both at the time of his arrest and when the interrogation began. In any case, the failure of Cox to obtain a ruling on waiver precludes our consideration of this issue. *Id.*

### III. Exclusion of Collins's Statements

Cox next claims that it was error for the circuit court to exclude incriminating statements made by Kingrale Collins to two separate people.[4]

The first statement that Cox desired to introduce was Collins's statement to Antonio Milam after the Strickland murder: "I shot the bitch." According to Cox, at the time Collins made that statement, he had the shotgun and shotgun shells in his hand. The second statement that Cox intended to introduce involved this colloquy between Collins and Keith "Rusty" Ward, the Cross County Jailer:

> COLLINS: Rusty, do you know what I'm charged with?
>
> WARD: No.
>
> COLLINS: It's a capital murder.
>
> WARD: Man, that's a heavy charge.
>
> COLLINS: Yeah, and I did it too.

The prosecutor stipulated that Collins was unavailable to testify but moved *in limine* that the statements be excluded as hearsay and because Cox and Collins were accomplices. The circuit court granted the motion and admonished Cox throughout the trial not to allude to these statements. Cox contends that this was error.

Specifically, Cox maintains that Collins's admissions constituted an exception to the hearsay rule under Ark. R. Evid. 804(b)(3), which reads:

---

[4] In his argument before the circuit court, Cox also wanted to introduce the fact of Collins's conviction. He does not pursue this in his appeal.

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

....

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability and offering to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.* A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused, is not within this exception. (Emphasis added.)

 Reading this rule, we first note that Collins was clearly unavailable. Going forward, the rule reads that a statement which exposes the declarant, in this case Collins, to criminal liability, and also exculpates the accused (Cox) is not admissible unless it is proven trustworthy by corroboration. Cox, in his arguments, focuses on the fact that the statements were against Collins's penal interests and were trustworthy, as shown by Collins's ultimate conviction. Nevertheless, we question the application of this rule when accomplices are involved. The prosecutor's theory of the case was that the two young men were accomplices, an issue that we have already discussed. The fact that Collins says he committed the murder does not exclude the fact that Cox was an accomplice and assisted in its perpetration. The jury found that Cox was culpable, after being instructed on the law of accomplice liability. Accordingly, we hold that the circumstances of these statements do not fall within the ambit of the hearsay exception set forth in Ark. R. Evid. 804(b)(3).

 Furthermore, we do not believe that our case of *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993), mandates a different conclusion, as Cox would have it. That case concerned the issue of third-party culpability and what is required, but it did not involve Rule 804(b)(3) or the issue of accomplice liability. Those matters govern our decision in the instant case. The circuit court did not abuse its discretion in denying the admission of these statements into evidence.

## *IV. Mistrial Motion*

Cox claims that the circuit court erred in not declaring a mistrial when the prosecutor made derogatory comments directed towards him in closing arguments. The prosecutor's comments, defense counsel's objection, and the circuit court's ruling follow:

> PROSECUTOR: It's ludicrous for Mr. Etoch to stand up here and try to tell you that Cox didn't know these things. Mr. Long told you in voir dire, sometimes people try to get you to believe some ridiculous things in here and they will. I made a list of some of the doozies I've heard so far. Labeled, "the crazy things you should not believe" if the defendant is polite during the interrogation, you can't convict him. It doesn't matter what comes out of his mouth. If he's polite, you can't convict him.

> DEFENSE COUNSEL: Your Honor, I object to that characterization that maybe I said something like that.

> COURT: I don't know that he said that, he asked some questions. I guess you can argue what you think he was getting at and going to.

> PROSECUTOR: Mr. Etoch is about to get up here and he's going to try to sell you a load of crap.

> DEFENSE: Your Honor, I object. I've been attacked, attacked, and attacked. Mr. Ladd does not have a clue as to what I'm going to say. He has no idea.

> COURT: Use a different phrase. The objection is sustained.

> PROSECUTOR: Mr. Etoch is about to get up here and tell you why his client is not guilty of killing Holly Holmes Strickland. I think all of the things he is about to tell you fall under number four in my list of "crazy things you should not believe."

> DEFENSE: Your Honor, may we approach?

Defense counsel then asked for a limiting instruction, and the circuit court refused.

 We have consistently held that the declaration of a mistrial is an extreme remedy, which should only be granted when

justice cannot be served by continuing the trial. *See, e.g., Williams v. State*, 343 Ark. 591, 36 S.W.3d 324 (2001); *Woods v. State*, 342 Ark. 89, 27 S.W.3d 367 (2000). Remarks that require reversal are rare and require an appeal to the jurors' passions. *Williams v. State, supra; Calloway v. State*, 330 Ark. 143, 953 S.W.2d 571 (1997); *Lee v. State*, 326 Ark. 529, 932 S.W.2d 756 (1996). The circuit court is given broad discretion to control counsel in closing arguments, and we only interfere with such discretion when there has been a manifest abuse of discretion. *Calloway v. State, supra; Wetherington v. State*, 319 Ark. 37, 889 S.W.2d 34 (1994).

The prosecutor's comment that defense counsel was about to sell the jury a "load of crap" was certainly crude and inappropriate. However, we conclude the circuit court correctly sustained defense counsel's objection and declined to declare a mistrial.

Cox further takes issue with the prosecutor's closing argument where this colloquy took place:

> PROSECUTOR: Think about what your experiences in life have taught you. If two people are involved in something like this together and you separate them and interview them, you ask them both, "did you pull the trigger?"

> DEFENSE: Your Honor I object. May I approach? (Then bench conference.) Your Honor, all these jurors know some facts about this case. Mr. Long has been going at it, on and on about he get (sic) in Kingrale Collins' statement and now he's saying that if two people are separated, each person says the other one did it. He's jut trying to get in Kingrale Collins' statement. I object and I move for a mistrial.

> PROSECUTOR: It's nothing but common sense, common argument.

> DEFENSE: He's arguing what the co-defendant said, not what Richard Cox said.

> COURT: Motion is denied.

> PROSECUTOR: You take these two people who you are trying to make criminally responsible for their activities and you separate them, you ask them both, did you pull the trigger? I leave it for you to determine if each of them was asked that question what it would be.

DEFENSE: I object.

COURT: Objections overruled.

PROSECUTOR: I leave it for you to deduce what each of the responses to that question would be, simply because they would both be trying to avoid as much responsibility as they could. "Oh, I carried, but I didn't pull the trigger. I loaded it, but I didn't pull the trigger."

DEFENSE: I guess this is a continuing objection, your Honor.

■ Cox argues that the prosecutor's argument amounted to the prosecutor's saying that Collins pointed the finger at Cox as the perpetrator of the murder just as Cox had said Collins committed it. We do not see it that way. Rather, it appears to us that the prosecutor broached a hypothetical situation and that his allusion, if any, was to Cox's statement where he admitted to only carrying the shotgun but not to pulling the trigger. In our judgment, there had to have been a more specific reference to Collins's statement, where he incriminated Cox and said he was the shooter, for error to have occurred. That did not transpire.

We discern no abuse of discretion when the circuit court overruled Cox's objection.

## V. Batson *Motion*

For his final point, Cox asserts that the circuit court erred in rejecting his *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79 (1986). Specifically, he urges that error was committed by not requiring the prosecutor to give a racially neutral reason for striking an African-American juror.

The facts surrounding his argument, according to Cox, are that fifty-four members of the *venire* were questioned as potential jurors in this case. Nine of those persons were African-Americans. Of those nine persons, seven were excused for cause by the circuit court, one was excused by agreement of the parties, and the one potential juror at issue, Dorothy Caddell, was excused by the prosecutors by peremptory challenge. The result was that Cox was tried by an all-white jury. Counsel for Cox underscores the significance of this because Cox is black and the victim, Holly Strickland, was white.

When Ms. Caddell was being questioned by the circuit court as part of *voir dire*, she admitted to having been the victim of a crime. In answer to the prosecutor's questions, she initially said that she could impose either the death sentence or life without parole on Cox and that she could also follow an instruction on accomplice liability. However, she later stated in response to the prosecutor's questions that she could not sentence a sixteen-year-old to death. She also advised defense counsel that she had previously served on a jury where the defendant was found not guilty. She further stated that her son-in-law was a policeman in Forrest City.

At the time that Dorothy Caddell was questioned as part of *voir dire* and then struck by the prosecutor, only seven jurors had been seated. Four African-Americans had been excluded by the circuit court or by agreement of the parties. Four additional African-Americans remained to be questioned. Defense counsel made his *Batson* motion and argued that a *prima facie* case had been made because there were no African-Americans on the jury and no racially neutral reason had been given to exclude Ms. Caddell. The circuit court responded that it found that a *prima facie* case showing a *Batson* violation had not been made. The prosecutor added that there had been no pattern of discrimination, which *Batson* requires for a violation. Defense counsel's retort was that the only black juror the prosecutor had a chance to strike, he struck. The circuit court then ruled:

> Well, in the event Mr. Long [prosecutor] explained it based on the answers to the questions, the Court would not find that she was subject to cause but there's ample reason to exercise peremptory based on the responses to the questions she was asked and whether he chooses to explain that or not, the Court would have to find that to be the case, and in any event it wouldn't matter.

 The essence of Cox's argument appears to be that a *prima facie* case was made under *Batson* when the prosecutor struck Ms. Caddell. Under the facts of this case, we disagree. This court has defined what must occur in order for a *prima facie* case to be made:

> The strike's opponent must present facts, at this initial step, to raise an inference of purposeful discrimination. According to the *Batson* decision, that is done by showing (1) that the strike's opponent is a member of an identifiable racial group, (2) that the strike is part of a jury-selection process or pattern designed to discriminate, and (3) that the strike was used to exclude jurors because of their race. In deciding whether a *prima facie* case has been made, the

trial court should consider all relevant circumstances. Should the trial court determine that a *prima facie* case has been made, the inquiry proceeds to Step Two. However, if the determination by the trial court is to the contrary, that ends the inquiry.

*MacKintrush v. State*, 334 Ark. 390, 398, 978 S.W.2d 293, 296 (1998).

▆▆▆ Certainly, Ms. Caddell, as an African–American, was part of a racially identifiable group. However, the circumstances at this stage of the *voir dire* do not support a finding that the strike was part of a process or pattern designed to discriminate or that the strike was used to exclude jurors because of their race. The prosecutor had made no other strikes of African–Americans at this stage, and there were four more African–Americans left on the *venire*. The mere striking of one African–American *venire* person does not automatically equate to a *prima facie* case for a *Batson* violation. *Cf. Wooten v. State*, 325 Ark. 510, 931 S.W.2d 408 (1996) (striking sole black person on *venire may* establish *prima facie* case; case did not say a *prima facie* case automatically was made).

▆▆▆ We will reverse a circuit court's *Batson* findings only when they are clearly against the preponderance of the evidence. *Sanford v. State, supra*; *Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997). The circumstances of this case do not show that the circuit court clearly erred.

The record has been reviewed for other reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.

THORNTON, J., dissents.

R AY THORNTON, Justice, dissenting. Although I agree with the majority opinion's disposition of issues one through four, I cannot agree with the conclusions reached by the majority in appellant's final point on appeal. Specifically, I cannot join the majority opinion in holding that the trial court did not err in finding that a *prima facie* case was not made, and consequently, that no race-neutral response was required before the court rejected appellant's *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79 (1986).

In *Batson*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from using peremptory challenges to exclude African-American *venire* persons from service on a jury because of their race. *Id.* To test whether a peremptory strike should be disallowed, a three-step process was articulated in *Purkett v. Elem*, 514 U.S. 765 (1995):

> Once the opponent of a peremptory challenge has made out a *prima facie* case of discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Id.*

In *Williams v. Groose*, 77 F.3d 259 (8th Cir. 1996), the Eighth Circuit was even more succinct:

> After a defendant makes a *prima facie* showing of racial discrimination in the Government's use of a peremptory challenge, the Government *must offer a race-neutral reason for the challenge.*

*Id.* (citing *Purkett, supra*) (emphasis added).

We have adopted this principle in Arkansas, requiring that when a *prima facie* showing of discrimination has been made, the party seeking to use a peremptory challenge is required to state a race-neutral reason for the challenge. *See MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998). In *MacKintrush*, we established a procedure for following the *Purkett* modification to *Batson*. We held that after a *prima facie* case was presented, it was necessary to proceed to step two, where the maker of the peremptory motion was required to state a race-neutral reason for the strike, after which the trial judge proceeds to step three. *MacKintrush, supra*.

The issue in the present case is whether the peremptory challenge was wrongfully used to strike the only African-American venire person who would otherwise have been seated on the jury panel, resulting in a trial by an all-white jury of an African-American defendant charged with the murder of a white woman. The trial court ruled that a *prima facie* case of discrimination had not been presented, and the trial court found that a race-neutral explanation was not required. The prosecution did not offer such an

explanation. In my opinion, this was clearly a reversible error by the trial court.

We turn to our case law to determine what is required to make a *prima facie* showing of discrimination in the context of a *Batson* challenge. Among the cases defining what is required to make a *prima facie* showing of discrimination are:

> 1. *Mitchell v. State*, 295 Ark. 341, 750 S.W.2d 936 (1988), where we stated:

> Where the use of a peremptory challenge excludes from the jury *all members of the defendant's minority race*, it is not necessary to show exclusion of more than one minority juror of the same race as the defendant to make a prima facie case of discriminatory use of a peremptory challenge.

*Id.* (Emphasis added.)

> 2. *Hollamon v. State*, 312 Ark. 48, 846 S.W.2d 663 (1993) provides:

> Accordingly the defendant must first establish a prima facie case of purposeful discrimination *which the appellant clearly did in this case when he pointed to a peremptory strike by the State dismissing the sole black person on the jury*.

*Id.* (Emphasis added.)

> 3. *Prowell v. State*, 324 Ark. 335, 921 S.W.2d 585 (1996), where we stated:

> This court has stated that a prima facie case may be established by: (1) showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose, (2) demonstrating total or serious disproportionate exclusion of blacks from the jury, *or* (3) showing a pattern of strikes, questions, or statements by a prosecuting attorney during voir dire.

*Id.* (emphasis added). The word *or* indicates that one of these factors must be present to establish a *prima facie* case.

This court suggested in *MacKintrush, supra,* that a *prima facie* case could be made by showing:

(1) that the strike's opponent is a member of an identifiable racial group, (2) that the strike is part of a jury-selection process or pattern.designed to discriminate, and (3) that the strike was used to exclude jurors because of their race.

*MacKintrush, supra.* This definition on which the majority relies does not incorporate the factors enunciated in *Prowell, supra.*

Although our research indicates that *Mitchell, supra* and *Hollamon, supra* have been limited by *MacKintrush,* I submit that *Mitchell, Hollamon,* and *Prowell, supra* are not overturned on this point by *MacKintrush, supra.* If *MacKintrush* is given the meaning that a *prima facie* case cannot be made unless a pattern is established, such an interpretation of our *MacKintrush* decision would fly in the face of the Supreme Court, which stated in *Batson*:

[A] defendant may make a *prima facie* showing of purposeful racial discrimination in selection of the *venire* by relying solely on the facts concerning its selection *in his case.*

*Id.* (Emphasis supplied.)

The Supreme Court further states that " 'a consistent pattern of official racial discrimination' is not 'a necessary predicate to a violation of the Equal Protection Clause.' " *Id.* (citing *Arlington Heights v. Metropolitan Housing Dep't Corp.,* 429 U.S. 252 (1977)). The Supreme Court then concludes that " '[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' " *Id.* (citing *Arlington Heights, supra*).

The Supreme Court then continued:

These principles support our conclusion that a defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.

*Batson, supra.*

Further, the Supreme Court gave the requirements for establishing a *prima facie* case:

To establish such a case, the defendant must first show that he is a member of a cognizable racial group . . . and that the prosecutor

has exercised peremptory challenges to remove from the venire members of the defendant's race.

*Id.* (citation omitted). This requirement is met in the case before us, as appellant is an African-American.

Next, the *Batson* Court states:

Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."

*Id.* (citing *Avery v. Georgia*, 345 U.S. 559 (1953)). Here, there is no doubt that by use of a peremptory challenge, the prosecutor had the opportunity to engage in invidious discrimination.

Finally, the Supreme Court states:

[T]he defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.*

With regard to this third factor, the fact that the only African-American venire person who was not excluded for other reasons from jury duty was stricken from the panel by the prosecutor's peremptory challenge is sufficient to show that a *prima facie* case was made, and it follows that the prosecutor should have been required to state a race-neutral reason for the strike. Under the Supreme Court's analysis in *Batson, supra,* as refined in *Purkett, supra,* a *prima facie* case can be established when only one juror is peremptorily struck because of race. Our state judiciary does not have authority to override the principles established by the Supreme Court, and consequently, our decisions in *Mitchell, supra, Hollamon, supra,* and *Prowell, supra* remain good law on the definition of a *prima facie* case.

The majority would now depart from this well-established standard for showing a *prima facie* case, and agree with the trial court's ruling that no race-neutral explanation is required. Perhaps that is because the majority of this court is able to discern from the record that a race-neutral explanation might have been offered if the trial court had required it. How do we know that? Is it not

equally possible that a prosecutor might explain that he thought he had a better chance of gaining a death sentence if all African-American venire persons were excluded from the jury? We will never know what explanation the prosecutor might have given, because he was not required to state his reasons for the strike. Surely, we are not charged with developing on appeal a race-neutral reason, and concluding that, because such a defensible reason might have been offered, there was no need to require the prosecutor to state a race-neutral explanation.

Because I cannot agree with that conclusion, I respectfully dissent.