2013 Ark. 193

**Michael Shane WINTERS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR12–537.**

Supreme Court of Arkansas.

May 9, 2013.

Brett D. Watson, Attorney at Law, PLLC, by: Brett D. Watson, for appellant.

Dustin McDaniel, Att'y Gen., by: Kathryn Henry, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Associate Justice.

Appellant, Michael Shane Winters, appeals the judgment of the Benton County Circuit Court convicting him of two counts of capital murder and two counts of aggravated robbery and sentencing him consecutively to two sentences of life imprisonment without parole for the capital murders and two sentences of life imprisonment for the aggravated robberies. Because Appellant was sentenced to life without parole, our jurisdiction of this appeal is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2012). Appellant raises two points for reversal. First, he contends that the statements he made to police should have been suppressed because they were coerced. Second, he contends that a witness, Arron Lewis, should have been allowed to testify as to a "statement against interest" that Appellant's accomplice made to Lewis. We find no merit to the appeal and affirm.

Because Appellant does not challenge the sufficiency of the evidence supporting his convictions, we need only recite the evidence presented that relates to the issues on appeal. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. Suffice it to say here that Appellant was tried by a Benton County jury and convicted of the aggravated robberies and capital murders of Christina Bishop and Louise Bishop. The Bishops were the forty-year-old mother and eighty-one-year-old grandmother of Appellant's accomplice, Nicholas Johansen. Nicholas Johansen is the half-brother of Appellant's girlfriend, Susan Martin. The Bishops were reported missing in June 2009. Their bodies were discovered in February 2010 in a makeshift grave on the property owned by the Johansen family. The cause of death of both victims was strangulation.

## I. *Confession*

As his first point for reversal, Appellant contends that the circuit court erred in denying his motion to suppress certain custodial statements he made to police. Appellant, who presented expert testimony that he is of borderline intellectual functioning, contends that he consistently denied involvement in the crimes until, after what he describes as repeated and prolonged interrogation, the police coerced a confession from him as to the location of the bodies and his involvement in the crimes. Specifically, Appellant contends that the officers made various promises to him, repeatedly preyed upon his concerns for his family and for giving the victims a proper burial, and then finally, due in part to his borderline intellectual functioning, coerced a confession. Appellant moved to suppress these statements as being obtained in violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; article 2, sections 8 and 10 of the Arkansas Constitution; and Rules 2.3 and 4.1 of the Arkansas Rules of Criminal Procedure. On appeal, however, Appellant maintains simply that his will was overborne and his confessions were "involuntary and in violation of constitutional rights."

Appellant's motion to suppress centered on four custodial interviews that occurred on February 16 and 17, 2010. The first interview on February 16, 2010, occurred at 9:00 a.m. and lasted approximately thirty minutes. The detectives testified at the suppression hearing that they sought this interview with Appellant, who was then incarcerated at the Benton County jail on other unrelated charges, because there had been a break in the case when Appellant's girlfriend, Susan Martin,[1] voluntarily came to the station on February 14 and again on February 15 to tell police that Appellant had previously confessed to her his involvement in the Bishop murders. During this interview, Appellant denied any involvement with the Bishop crimes. At its conclusion, the officers returned Appellant to the Benton County jail.

The second interview on February 16, 2010, was at 1:00 p.m., and it also lasted approximately thirty minutes. During the hours intervening between the first and second interview, a search of the Johansen property was underway, and the interviewing officers obtained photographs from the search showing the victims' purses and other personal effects. During this second interview, the detectives showed Appellant the photographs and also informed Appellant of Susan Martin's previous discussions with police incriminating Appellant. According to Appellant, it was during this interview that the officers began using coercive tactics such as repeatedly invoking his concern for his girlfriend as well as for giving the victims a proper burial. Appellant points out that the officers asked Appellant to "put the shoe on the other foot. If this was your family wouldn't you want to find them so you can give them a proper ... burial. Think about your wife being underground right now." At this

point, Appellant asked if the officers could arrange for him to see Martin if he helped them. The officers replied that they could arrange for a meeting and then continued to appeal to him to find the courage to tell them where they could "find these ladies." Appellant agreed, saying, "I'll tell you if I can see my wife." Appellant then left with the detectives, who bought him some cigarettes and drove him to Martin's residence. As she was not home, Appellant then directed the officers to the Johansen property and showed them where the bodies were buried. On the return trip to the police station, the officers made a second attempt for Appellant to visit with Martin at her residence, but she still was not home.

The third interview occurred later in the day on February 16, 2010, at 4:10 p.m., after Appellant had shown the detectives the location of the bodies on the Johansen property. This interview lasted approximately three and one-half hours, and Appellant admitted to his further involvement in the Bishop murders and to disposing of their bodies. The fourth interview occurred the next day on February 17, 2010, and lasted approximately twenty minutes, with the officers asking a few follow-up questions from the events of the day before.

All four statements were recorded by audio and transcribed. It is undisputed that Appellant was in custody at the time he gave the statements, but he does not challenge the admissibility of the statements based on any *Miranda* violation. Although Appellant challenges the admission of all four statements on the basis that they were coerced, he complains that the initial coercion occurred during the second interview on February 16 and

---

1. At some points in the record below, Martin is referred to as Appellant's wife. Appellant's brief on appeal refers to her as his girlfriend, and therefore we do likewise.

therefore all statements after that must be suppressed as fruit of the poisonous tree.

The circuit court denied the motion to suppress, ruling from the bench that it was clear to the court that Appellant's statement was voluntarily, knowingly, and intelligently given even beyond the preponderance-of-the evidence standard. The circuit court found there was no intimidation, coercion, or deceptive practices to cause the statement to be anything other than voluntarily, knowingly, and intelligently given. The circuit court went on to state that its decision took into account that Appellant had had previous encounters with law enforcement where he had waived his rights and given statements in unrelated cases. The circuit court also noted that no physical or mental punishment was used. The court noted that the officers endeavored to take Appellant to his girlfriend's apartment twice when they went to locate the bodies on the Johansen property and that Appellant appeared grateful for the opportunities. The circuit court specifically observed that the questioning of Appellant was calm and low-key. Finally, the court noted its surprise at the intellectual functioning of Appellant during the interviews, despite the expert evidence of his IQ being relatively low. The court noted that Appellant engaged the officers in a "cat-and-mouse" game. The circuit court concluded that it did not find Appellant to be a vulnerable individual and did not find the police interrogation of him to be coercive.

■ Our standard of review for cases involving a trial court's ruling on the voluntariness of a confession is that we make an independent determination based on the totality of the circumstances, and we reverse the trial court only if its ruling is clearly against the preponderance of the evidence. *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003). A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Id.* This court looks to see if the confession was the product of free and deliberate choice rather than coercion, intimidation, or deception. *Id.* To make this determination, we review the totality of the circumstances surrounding the statement including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; statements made by the interrogating officers; and the vulnerability of the defendant. *Osburn v. State,* 2009 Ark. 390, 326 S.W.3d 771. We have previously held, in determining whether a statement was the product of coercion, that it must be demonstrated that the activity of the police had a particular effect upon the accused, such that "there must be an 'essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other.'" *Id.* at 22–23, 326 S.W.3d at 785 (quoting *Standridge v. State,* 357 Ark. 105, 122, 161 S.W.3d 815, 824 (2004) (quoting *Colorado v. Connelly,* 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986))). The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired. *Osburn,* 2009 Ark. 390, 326 S.W.3d 771.

■ Our review of the totality of the circumstances begins with Appellant's claim of prolonged questioning with coercive tactics. As for the length of questioning, we note that most of the interviews lasted around thirty minutes, with the longest interview lasting three and one-half hours, but with a break in the midst.

Appellant noted during that interview that the detectives had been good to him.

The tactics Appellant challenges are the references to Appellant's girlfriend and to the proper burial of the victims. Despite Appellant's contention that the tactics used in his interviews were similar to those used in *Osburn,* we disagree. *Osburn* involved a situation where the accused had invoked his right to counsel, which was ignored, and he was then repeatedly threatened with the possible prosecution of his children if he did not confess. In the present case, in contrast to *Osburn,* the officers communicated to Appellant the true fact that, after approximately seven or eight months since the Bishops' disappearance, Appellant's girlfriend, Susan Martin, voluntarily presented herself to police and gave them a statement implicating Appellant. While the officers repeatedly described her statement to them as one that she gave with great emotion because "it was killing her" to continue to keep her knowledge to herself, the officers never threatened to pursue prosecution of her or of Appellant's children if he did not confess, as was the case in *Osburn.* Moreover, our review of the interview reveals that it was Appellant who first inquired as to whether Martin was "in any trouble." And it was in response to that question that the officers told Appellant that they had not "talked about charging her" and that if Appellant told them "everything" they would relate to the prosecuting attorney that he had done so. This is simply not a threat of Martin's prosecution nor was it a promise of leniency for Appellant. In fact, this court has previously held that when an interviewing officer merely offers to tell the prosecuting attorney that the accused cooperated, that does not constitute a false promise of leniency that renders the statement involuntary. *Cox v. State,* 345 Ark. 391, 47 S.W.3d 244 (2001).

As for the tactic of a proper burial for the victims, the officers did, in fact, repeatedly ask Appellant to tell them where the bodies were so that he could be the one to see to it that the victims were given a proper burial. And, as Appellant points out, the officers even asked Appellant to picture his wife in the position of the victims. However, after reviewing this statement, it is clear that this was an attempt by the officers to appeal to Appellant's sense of morality to tell the truth and to do the right thing and did not have the effect of overbearing Appellant's will or critically impairing his capacity for self-determination. As this court has previously held, the police may use some psychological tactics in eliciting a custodial statement from an accused. *See Noble v. State,* 319 Ark. 407, 892 S.W.2d 477 (1995), *overruled on other grounds by Grillot,* 353 Ark. at 309, 107 S.W.3d at 145.

█ Finally, we consider Appellant's argument that his relatively low level of education and intellectual functioning contributed to the officers' ability to coerce a confession from him. The record reveals that Appellant was twenty-nine years old when he gave the statements, that his formal education ended at either the sixth or eighth grade, and that he obtained a G.E.D. while incarcerated. Appellant's expert witness, Dr. J. Michael Wood, testified that his full-scale IQ was 84, which is in the category of borderline intellectual functioning. Dr. Wood stated that this is in the low-average range and places him in the 14th percentile, meaning that 86 percent of the population has a higher IQ than Appellant. Dr. Wood explained that his full-scale IQ score was the result of fourteen tests in seven areas and that Appellant scored significantly lower in one of these seven areas—processing speed. Dr. Wood opined that processing speed is the ability to think efficiently and

fluently, especially under pressure situations. The circuit court acknowledged Appellant's IQ score and even expressly deferred to the experts on this issue, despite the court's contrary observations of Appellant during the interviews. But, as noted by the circuit court, Appellant was no stranger to the criminal-justice system, having been interviewed, and giving voluntary statements perhaps as many as six times, concerning crimes unrelated to the Bishop murders. Three officers who previously interviewed Appellant testified at the suppression hearing, and although one of them noted Appellant could not read or write well, *all* agreed that Appellant understood and waived his rights and gave a statement voluntarily and knowingly. We note that this court has held that a low score on IQ tests does not mean the suspect is incapable of making a voluntary confession. *See Roberts v. State,* 352 Ark. 489, 102 S.W.3d 482 (2003) (upholding confession of thirty-one-year-old with IQ of 76).

In summary, our review of the totality of the circumstances indicates that the circuit court's ruling to deny the motion to suppress was not clearly against the preponderance of the evidence. The circuit court's conclusion that Appellant was not vulnerable and gave his statement voluntarily and free of coercion is supported by the foregoing evidence and was made in accordance with applicable law. Appellant did encounter well-trained police officers, who admitted that they employed tactics and techniques designed to get the truth from Appellant. However, even given his relatively low level of education and intelligence, there is simply no evidence on this record that Appellant's will was overborne or that his capacity for self-determination was so critically impaired that he gave a false confession as a result of coercion. We therefore find no merit to Appellant's first point for reversal that his second statement was obtained by coercion and that the third and fourth statements should be suppressed as fruits of the poisonous tree.

## II. *Proffered Testimony of Arron Lewis—Statement Against Interest*

■ As his second point for reversal, Appellant contends that the circuit court abused its discretion in excluding the proffered testimony of defense witness Arron Lewis. Lewis met Nicholas Johansen, who was Appellant's accomplice, while both were cellmates incarcerated at the Benton County jail. In his proffered testimony, Lewis stated that Nicholas Johansen had confessed that he, not Appellant, had committed the murders. According to Lewis, Johansen stated that Appellant went with him to the Bishop residence to get money, that Appellant waited in the driveway, and that Appellant helped him dispose of the bodies only after he threatened to pay Susan Martin a visit. Appellant argues on appeal, as he did at trial, that Lewis's testimony of Johansen's confession was admissible as a "statement against interest."[2]

■ The hearsay exception for statements against interest is governed by Rule 804(b)(3) of the Arkansas Rules of Evidence, which states in pertinent part as follows:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay

2. Although Appellant argued below that the exclusion of Lewis's testimony prevented him from presenting a complete defense in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and sections 3, 8 & 10 of article 2 of the Arkansas Constitution, he does not pursue the constitutional argument on appeal.

rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement which was at the time of its making . . . so far tended to subject him to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offering to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused, is not within this exception.

Ark. R. Evid. 804(b)(3) (2012). In applying this exception, this court has stated that the proponent must show (1) that the declarant is unavailable, (2) that the statement at the time of its making "so far tended to subject him to criminal liability" that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement. *Williford v. State,* 300 Ark. 151, 155, 777 S.W.2d 839, 842 (1989). Absent an abuse of discretion, this court will not reverse a trial court's ruling on the admissibility of a statement against penal interest. *Id.*

The State does not dispute that Johansen was unavailable and that his statement to Lewis tended to subject him to criminal liability. Appellant thus contends that in excluding Lewis's testimony, the circuit court abused its discretion in two respects. First, Appellant argues that the circuit court erroneously focused on the credibility of the witness Lewis rather than on the trustworthiness of the declarant Johansen's statement. Appellant argues that by focusing on Lewis's credibility, the circuit court usurped the jury's role to determine credibility. This might have some degree of merit *if* the statement had been admissible, but it was not, as explained later herein. Second, Appellant argues that the circuit court found Rule 804(b)(3) inapplicable based on the erroneous conclusion that Johansen's statement did not exculpate Appellant from the murders; rather, they implicated him "at least in terms of being at the scene with Mr. Johansen and burying the bodies together." In this respect, Appellant argues that the circuit court erroneously considered Johansen's statement as implicating Appellant for a crime for which he was not charged, rather than as exculpating Appellant from the crimes for which he was charged. Appellant's latter argument here overlooks the fact that Appellant was charged with having committed capital murder by way of accomplice liability. Neither of Appellant's arguments demonstrates an abuse of discretion.

In *Cox,* 345 Ark. 391, 47 S.W.3d 244, this court noted that a statement against interest that does not entirely exculpate the accused may not be admissible. This court went on to question in *Cox* the applicability of this hearsay exception when accomplices are involved. Our review of the record reveals that the circuit court began its analysis of this issue with the initial conclusion that Johansen's statement to Lewis "implicated [Appellant] at least in terms of being at the scene with Mr. Johansen and burying the bodies together."

We see no abuse of discretion in the circuit court's observations in this regard. The prosecutor's theory of the case against Appellant was that he and Johansen were accomplices. The jury was

instructed on accomplice liability and found Appellant guilty after being so instructed. The law in Arkansas makes no distinction between the criminal liability of a principal and an accomplice. Ark.Code Ann. § 5–2–402(2) (Repl.2006). We have held that under the accomplice-liability statute, a defendant may properly be found guilty not only of his own conduct but also the conduct of his accomplice. *Purifoy v. State*, 307 Ark. 482, 822 S.W.2d 374 (1991). When two or more persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.* An admission by one does not exculpate the other. *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001).

As the State points out, the fact that Johansen told Lewis that he, not Appellant, committed the murders does not negate Appellant's liability as an accomplice because the statement did not establish that Appellant was an innocent bystander or disavow Appellant's participation in the plan to rob and kill the Bishops. For, as Appellant himself argues when trying to demonstrate the corroboration of Johansen's statement to Lewis, both Johansen and Appellant stated that they went to the Bishops' house with the purpose of borrowing money; both Johansen and Appellant stated that Appellant waited in the driveway while Johansen asked for the money; and both Johansen and Appellant agree that Appellant did not commit the murders but both admit that Appellant helped load the bodies into the truck after the women had been murdered. Thus, it is clear that the circuit court did not abuse its discretion by excluding Lewis's testimony as to Johansen's statement against interest because the statement did not entirely exculpate Appellant; rather, it implicated Appellant as an accomplice in the Bishop robberies and murders.

As for the aspect of Appellant's argument concerning the circuit court's evaluation of the credibility of the witness rather than the trustworthiness of the statement, we note that while the circuit court did consider the reliability of the witness Lewis, that was not the sole basis of the court's ruling. We therefore do not believe that such consideration by the trial court mandates that we reach a different result on appeal. For, as we just discussed, the circuit court had already initially based its ruling on the fact that Johansen's statement to Lewis did not exculpate Appellant but implicated both Appellant and Johansen. The circuit court's ruling is affirmable on that basis alone. Moreover, this court has held that statements of accomplices "fail decidedly to meet that test" of having "corroborating circumstances [to] clearly indicate the trustworthiness of the statement." *Tillman v. State*, 275 Ark. 275, 284, 630 S.W.2d 5, 10 (1982).

In summary, we see no abuse of discretion in the circuit court's decision to exclude the testimony of Arron Lewis as to Nicholas Johansen's statement against penal interest. The proffered statement did not exculpate Appellant, and the circuit court based its ruling, in part, on that fact. Contrary to Appellant's assertion in reply, our conclusion does not amount to a per se rule that the hearsay exception will never apply in an accomplice-liability situation; rather, it is simply a conclusion that the exception is not applicable to the facts here presented, where accomplices are involved, and the statement of one does not exculpate the other.

### III. *Statement of Compliance with Rule 4–3(i)*

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2012), the record has been examined for all objections, motions, and

requests made by either party that were decided adversely to Appellant, and no error prejudicial to the rights of Appellant has been found.

For the aforementioned reasons, the judgment of convictions is affirmed.

BAKER and HART, JJ., concur.

KAREN R. BAKER, Justice, concurring.

I concur with the majority's decision to affirm the convictions of Winters in this case. I write separately because I believe the circuit court abused its discretion in excluding the testimony of Lewis.

The majority concludes that the testimony was properly excluded because the testimony implicated both Winters and Johansen, as accomplices. However, Johansen's statement implicated Winters only as an accomplice in concealing the bodies. Thus, even though Johansen's statement implicated Winters as an accomplice in a crime, it was nonetheless exculpatory evidence as to the charges of capital murder and aggravated robbery. Therefore, Lewis's testimony should have been allowed.

The majority relies on *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001), which questions the applicability of the hearsay exception when accomplices are involved. However, in *Cox*, the statement against interest was only that Kingrale Collins had committed the homicidal act. It did not exculpate Cox from accomplice liability because it did not exclude the fact that Cox was an accomplice and assisted in the perpetration of the homicidal act. Here, the statement against interest showed that Winters did not assist in the perpetration of the homicidal act.

Johansen's statement was that he committed both murders while Winters was at the end of the driveway. He then threatened to "pay a visit" to Winters's girlfriend if he did not help hide the bodies and that Winters helped him load the bodies into the truck and bury them. These statements are corroborated by Winters's own statement, that he only helped load the bodies into the truck and hide them because Johansen had threatened his girlfriend.

Winters argues that the circuit court erroneously focused on the credibility of Lewis rather than on the trustworthiness of Johansen's statement. He argues that by focusing on Lewis's credibility, the circuit court usurped the jury's role to determine credibility. Winters is correct that this was error. *See Generally Ward v. State*, 298 Ark. 448, 770 S.W.2d 109 (1989) (In reviewing the admissibility of a hearsay statement pursuant to our Rules of Evidence, we look to the reliability of the statement itself).

The circuit court also erred in finding that the statement should be excluded under the last sentence of Arkansas Rule of Evidence 804(b)(3), which states that a statement *offered against the accused* in a criminal case, made by a person implicating both himself and the accused, is not within the exception. As the statement here was not offered against Winters, the last sentence of 804(b)(3) does not apply.

Although, I believe the circuit court erred in excluding Lewis's testimony, the error was harmless beyond a reasonable doubt in this instance because the State's evidence of his guilt was overwhelming. *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999). The State presented evidence that Winters confessed to detectives that he had suffocated one of the victims. The State also presented Susan Martin's testimony that Winters and Johansen planned to rob and kill the victims, and that Winters had taken a gun with him on the night of the murders. She further testified that Winters told her that he had choked one of

the victims and slammed the other's head against the floor. Finally, the State presented John Russell Johansen's testimony that both Johansen and Winters had spoken to him about ⌊17 Winters committing one of the murders. Because the evidence of Winters's guilt was overwhelming, I would affirm Winters's convictions. Therefore, I concur.

HART, J. joins.