2012 Ark. 347

**Charles Wayne GREEN, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 11–1269.**

Supreme Court of Arkansas.

Sept. 27, 2012.

Jeff Rosenzweig, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Jake H. Jones, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice.

Appellant Charles Wayne "Chad" Green was convicted of four counts of capital murder and one count of kidnapping. He received life sentences for each count of capital murder and a forty-year sentence for the count of kidnapping. On appeal, he contends that the State's use of inconsistent prosecutorial theories in his trial and in the separate trial of a co-defendant denied him due process of law, or alternatively, that the State was judicially estopped from arguing inconsistent theories. He also contends that, because the police failed to inform him that he was under no legal obligation to comply with their request to speak with them, Arkansas Rule of Criminal Procedure Rule 2.3 was violated and any subsequent statements to police should have been suppressed. We affirm.

In 2003, Chad and his father, Billy Dale Green, were charged with four counts of capital murder for the deaths of Lisa and Carl Elliot and their two children, Gregory and Felicia, and one count of kidnapping. Chad was also charged with rape in a separate incident. Chad entered into plea agreements in both cases, and pursuant to the agreements, he pled guilty to one count of first-degree murder and one count of kidnapping, pled no contest to the rape counts, and testified for the prosecution in Billy's case.

Billy was convicted of four counts of capital murder and one count of kidnapping and was sentenced to death on each count of capital murder and life imprisonment on the count of kidnapping. In *Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006), we reversed Billy's convictions and remanded for a new trial, based on the circuit court's error in allowing the State

to present reputation and other bad-acts evidence. In 2006, the State sought to re-interview Chad in preparation for Billy's new trial, but he refused, so the State filed a motion to vacate Chad's judgment and commitment order and to reinstate the original charges against him. The circuit court granted the State's motion, and this court affirmed. *See Green v. State,* 2009 Ark. 113, 313 S.W.3d 521.

Before trial, Chad filed a Motion to Prohibit the Prosecution from Arguing Contradictory Theories of the Case, in which he contended that the circuit court should "prohibit any evidence and prosecution inconsistent with the position it took in Billy Green's trial." Chad stated in his motion that he believed the prosecution would claim in his trial that he was the actual killer, "a position totally at odds with the prosecution's position in the Billy Green trial." Further, Chad contended that the doctrine of judicial estoppel prevented the prosecution from arguing contradictory theories in the trials of co-defendants. The circuit court held a hearing and denied Chad's motion. Additionally, Chad filed a motion to suppress statements he had made to police officers in August and October of 1998. That motion was also denied after a hearing. Subsequently, Chad was brought to trial and convicted of four counts of capital murder and one count of kidnapping.

## I. *Inconsistent Theories*

### A. Due Process

In his first argument on appeal, Chad contends that he was denied due process of law under the United States Constitution and the Arkansas Constitution because the State's arguments at his trial were inconsistent with the State's arguments at Billy's trial. Chad claims that in Billy's trial, the State argued that Billy had been the "primary actor," while Chad was actually a "peripheral character" who acted out of fear of Billy. But in his trial, Chad claims, the State argued that he had been "equally involved" in the crimes.

■ Chad's argument on appeal presents a question of law, which this court reviews de novo. *E.g., Scissom v. State,* 367 Ark. 368, 240 S.W.3d 100 (2006). In support of his due-process argument, Chad relies on *Smith v. Groose,* 205 F.3d 1045 (8th Cir.2000), where the United States Court of Appeals for the Eighth Circuit held that a due-process violation occurs when the State uses inherently factually contradictory theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event. *Id.* at 1049, 1052. The State contends that Chad's reliance on *Smith* is misplaced because *Smith* addressed two different theories argued by the State, where in this case, there is only one theory argued by the State—the theory argued in Chad's case. According to the State, Chad cannot avail himself of the decision in *Smith* because Billy's 2004 convictions were reversed and remanded, which means there is no theory against which to compare the theory used in Chad's case. Therefore, the State contends, Chad's convictions stand alone.[1]

---

1. The State asserts that unless and until Billy is again tried, a claim such as that which succeeded in *Smith* has not even arisen. Chad noted in his brief on appeal that Billy was scheduled for retrial, and he stated that, if appropriate, he would seek to supplement his argument with what the prosecution argues in Billy's retrial. We take judicial notice that Billy has been retried and that the Randolph County Circuit Court on May 9, 2012, entered a judgment and commitment order against Billy for four counts of capital murder and one count of kidnapping. Chad has not sought to supplement his argument.

"[W]hen a judgment is reversed and remanded for new trial, the case stands as if no action at all had been taken by the trial court." *Palmer v. Carden,* 239 Ark. 336, 338–39, 389 S.W.2d 428, 430 (1965). "[T]he rights of the parties are immediately restored to the same condition in which they were before its rendition." *Forever Green Athletic Fields v. Lasiter Constr.,* 2011 Ark. App. 347, at 23, 384 S.W.3d 540, 555. *See also Ex parte Nickerson,* 893 S.W.2d 546, 548 (Tex.Crim. App.2009) (holding that "no conviction remains when the judgment has been reversed and remanded for a new trial" and that "the sentence is no longer in effect ... because it no longer exists"). Here, when this court reversed and remanded Billy's convictions and sentence, *see Green,* 365 Ark. 478, 231 S.W.3d 638, we returned the parties to the same situation as that in which they were before trial. For the purposes of this appeal, the State's theory in Billy's case no longer existed when Billy's case was reversed and remanded. Thus, when Chad filed his Motion to Prohibit the Prosecution from Arguing Contradictory Theories of the Case, there was no longer a theory in Billy's case for the State to "contradict" in Chad's case.[2]

Nonetheless, Chad would have this court hold that, even though Billy's first trial was reversed and remanded, the State is bound by the theory it argued in the first trial, but he offers no authority for that proposition. This court will not consider an argument, even a constitutional one, when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. *E.g., Hollis v. State,*

346 Ark. 175, 55 S.W.3d 756 (2001). Because Billy's case was reversed and remanded, there is no earlier theory to compare with the theory argued in Chad's case. Accordingly, we do not reach the merits of Chad's claim that he is entitled to relief under *Smith.*

### B. Judicial Estoppel

Chad next argues, in the alternative, that the doctrine of judicial estoppel prevents the prosecution from arguing contradictory theories in the trials of co-defendants. A prima facie case of judicial estoppel includes the following elements: (1) a party must assume a position clearly inconsistent with a position taken in an earlier case, or with a position taken in the same case; (2) a party must assume the inconsistent position with the intent to manipulate the judicial process to gain an unfair advantage; (3) a party must have successfully maintained the position in an earlier proceeding such that the court relied upon the position taken; and (4) the integrity of the judicial process of at least one court must be impaired or injured by the inconsistent positions taken. *Dupwe v. Wallace,* 355 Ark. 521, 533–34, 140 S.W.3d 464, 472 (2004). Because Billy's convictions were reversed and remanded, there is no earlier case or proceeding to compare to Chad's case. Therefore, the doctrine of judicial estoppel is inapplicable. We hold that the circuit court did not err in denying Chad's Motion to Prohibit the Prosecution from Arguing Contradictory Theories of the Case.

### II. *Motion to Suppress*

In his second point on appeal, Chad challenges the denial of his motion to sup-

---

2. Billy has been retried, but we do not know what theory the State pursued in the retrial. Billy has appealed to this court and has lodged the record, but this court does not take judicial notice of the record in other cases. *E.g., Anderson v. State,* 2011 Ark. 488, 385 S.W.3d 783.

press two statements he made to police officers in August and October 1998. Specifically, Chad contends that those statements should be suppressed because they were taken in violation of Arkansas Rule of Criminal Procedure 2.3, which addresses the warning to persons asked to appear at a police station.

When reviewing the denial of a motion to suppress evidence obtained after an alleged violation of Rule 2.3, this court conducts a de novo review based upon the totality of the circumstances, reversing only if the circuit court's ruling is clearly against the preponderance of the evidence. *E.g., Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. Any conflicts in the testimony are for the circuit court to resolve, as it is in a superior position to determine the credibility of the witnesses. *E.g., Morgan v. State*, 2009 Ark. 257, 308 S.W.3d 147.

While Rule 2.3 does not require an explicit statement that one is not obligated to appear or remain at a police station, *see Baker v. State*, 363 Ark. 339, 341, 214 S.W.3d 239, 240 (2005), if a law enforcement officer acting pursuant to the Rule requests any person to come to, or remain at, a police station, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request. Ark. R.Crim. P. 2.3 (1998). This court views verbal admonition of freedom to leave as one factor to be considered in our analysis of the total circumstances surrounding compliance with Rule 2.3. *Baker*, 363 Ark. at 341, 214 S.W.3d at 240. When interpreting Rule 2.3, this court looks to the criteria set forth in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), to determine whether a person has been seized within the meaning of the Fourth Amendment to the United States Constitution. *E.g., Vance, supra.* The Court has held that

a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. 1870 (footnote and citations omitted).

### A. August 8, 1998 Statement

The murders and kidnapping in this case took place on or about July 29, 1998. Rob Samons, the Randolph County Sheriff at the time of the crimes, testified at the suppression hearing that when he took Chad's statement on August 8, 1998, he and other police officers "were just trying to talk to anybody that we knew of that might have been associated with, acquainted with, or in the area of where the Elliotts lived." Samons stated that, after police learned that Chad might have been a friend or acquaintance of the Elliotts, he or another law enforcement officer left a message for Chad and requested that he come to the sheriff's office. Samons testified that Chad came to the sheriff's office voluntarily and that he spoke to Chad in his personal office, where the door was not locked. According to Samons, he and Chad were the only ones present, Chad was not handcuffed, and he did not threat-

en or coerce Chad in any way. Samons testified that Chad was free to leave at any time and that he did not ask for an attorney. Samons stated that he did not Mirandize Chad because, at that time, police were just talking to anyone who might have information that could assist in the investigation. Chad gave Samons an exculpatory statement, which Samons noted and Chad signed. Chad left the sheriff's office after giving the statement. Samons testified that he could not remember if he had complied with Rule 2.3.

Chad testified at the suppression hearing that, after he received a message that police wanted to speak to him, his mother took him to the sheriff's office. He said that the police "made it a point that [he] needed to show up." He said that when he arrived at the sheriff's office, he was not informed that he was not required to comply with the request to come there.

Chad asserts that his August 8 statement should be suppressed because there is no evidence that the police complied with Rule 2.3. We disagree. Although Samons could not say whether he complied with Rule 2.3, his testimony indicates that he took steps to make it reasonably clear to Chad that he had no obligation to comply with the request to talk. Although Chad testified that the police had "made it a point that [he] needed to show up," the circuit court is not required to believe the testimony of any witness, including the accused. We hold that the circuit court's denial of Chad's motion to suppress his August 8 statement is not clearly against the preponderance of the evidence.

### B.   October 17, 1998 Statement

On October 17, 1998, Samons and Arkansas State Police Investigator Steve Huddleston served a search warrant on Chad to collect samples of his blood, hair, fingerprints, and palm prints. After serving the warrant, Samons and Huddleston took Chad into custody and transported him to the Randolph County Hospital to obtain a blood sample. Chad was next transported to the Pocahontas jail for fingerprinting and palm printing and then to the sheriff's office to provide hair samples.

Chad initially refused to provide the hair samples, so he was handcuffed. He then asked to call his father, Billy, who advised him to provide the samples. When Chad agreed to provide the samples, the handcuffs were removed.

Samons could not recall whether he advised Chad that he was free to go after the samples were taken. Huddleston first testified that, after the samples had been collected, Chad was advised that he did not have to stay and was free to go. But on cross-examination, Huddleston testified that he did not recall whether Chad had been told specifically that he was "free to go," only that Samons said, "Before you leave, we would like to talk to you." Chad testified that he was not told he was free to leave after the samples had been collected.

According to Samons, after the collection process, he asked Chad if he would talk to him, and Chad agreed. Samons and Huddleston both testified that Chad was read and advised of his *Miranda* rights. Huddleston stated that, after Chad had been read his rights and asked to sign to acknowledge those rights, "[h]e said that even though he understood his rights and he would talk to us, he would not sign anything." Chad then gave the police an exculpatory statement. Both Samons and Huddleston testified that Chad was neither threatened or coerced into making a statement nor promised anything in exchange for making a statement. Chad testified that he did not ask for an attorney.

Chad contends that the October 17 statement should be suppressed because there is no evidence of compliance with Rule 2.3. Based on the record before us, we are not convinced that, with respect to this statement, the officers took steps to make it reasonably clear to Chad that he had no obligation to talk with them. Contrary to the State's contention in its brief on appeal, Huddleston's testimony does not indicate that Chad was explicitly told that he was free to go. In view of all the circumstances surrounding the incident, including the fact that Chad had been served with a search warrant and taken into custody by the police, the fact that he had previously been handcuffed when he failed to comply with a request from the police, and the fact that Chad was not told he was free to leave, we conclude that a reasonable person would have believed that he was not free to leave. Here, the officers' actions amounted to a seizure of Chad within the meaning of the Fourth Amendment. Nevertheless, we conclude that Chad's statement need not be suppressed. While not every Fourth Amendment seizure triggers a right to *Miranda* warnings, *see United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir.1988), in this case, Chad was Mirandized before he made the statement and advised of his rights to remain silent, seek counsel, and discontinue the interview at any time. We hold that the circuit court's denial of Chad's motion to suppress his October 17 statement is not clearly against the preponderance of the evidence.

The record in this case has been reviewed for reversible error pursuant to Arkansas Supreme Court Rule 4–3(i), and none has been found.

Affirmed.