BART F. VIRDEN, Judge
A Mississippi County jury convicted appellant Michael Jackson as an accomplice to first-degree murder and aggravated robbery in connection with the shooting death of Yuri McKeever. Jackson was sentenced to an aggregate term of forty years'
*57 imprisonment. On appeal, he argues that the trial court erred in denying his directed-verdict motion and that the trial court abused its discretion in admitting a recording of clips from a surveillance video. We affirm Jackson's convictions.
I. Trial Testimony
Eric Farrell, a former detective with the Blytheville Police Department, testified that on June 8, 2016, he responded to the scene of a shooting at a residence belonging to Yuri McKeever. He entered the residence and saw the victim lying face down on the living-room floor in a puddle of blood. Dr. Charles Kokes later testified that Yuri died from two gunshot wounds to the back of his head. Farrell took several photos of the crime scene depicting, among other things, the victim's pockets turned inside out, marijuana and drug paraphernalia, multiple cellular telephones, and a DVR and monitor. He described the residence as a "trap house," meaning that it was used for trafficking narcotics.
Farrell stated that there was a camera outside the home pointed toward the victim's front door. He said that the surveillance system was operating because there was a live feed showing his actions, as well as the actions of other law-enforcement officers and EMTs at the scene. He said that he took the DVR to the criminal-investigation division's office and hooked it up to a monitor. Farrell conceded that the footage had an incorrect date and time stamp in that it was off by one day and several hours; however, he created a timeline by going back, scene by scene, until he saw Yuri entering the home that day. He testified that he was unable to make a copy directly from the DVR, so he recorded clips of activity using a camcorder while the surveillance video played on the DVR. Farrell said that he recorded footage from the DVR in ten sections showing everyone who had come to the door after Yuri entered the residence. Based on what was shown on the surveillance video and the identification of the suspects by Yuri's family members, Farrell got arrest warrants for Michael King and Michael Jackson.
Farrell testified about what he saw on the silent video: Yuri arrived at the residence around 9:20 a.m. Jackson knocked and entered the residence around 9:30 a.m., and King arrived approximately one minute later. As Jackson was leaving the residence, he held the door open for King to enter. Jackson was "walking real slowly, kept looking back," and then he turned abruptly and went back toward the house "in a hurried manner." Jackson used his t-shirt to open the door and went inside. Jackson was then seen "sprinting" from the house and carrying a bag that he had not had earlier. King could be seen running behind Jackson and pulling something-maybe socks or gloves-from his hands.
Amber McKeever, Yuri's sister, testified that she had identified Jackson and King on the surveillance video. She said that she had grown up with Jackson and that he was Yuri's best friend. She said that she knew King and that he was also friends with Yuri. Amber identified the bag that Jackson was seen carrying and said that it belonged to Yuri. She said that Yuri kept valuables in the bag, such as money, and possibly drugs.
Amber also testified about Yuri's surveillance system. She said that Yuri had installed the system because someone had broken into the residence and stolen items and that Yuri had wanted to see "the goings and comings at his apartment." Amber testified that she knew the system had a recording function but that that fact was not something Yuri "put out, as far as it records." Two of Yuri's sisters, Kambri *58 Wells and Tashesa Wells, testified that they knew Jackson and King, that both men were Yuri's friends, and that the bag that Jackson was carrying belonged to Yuri. One of the sisters pointed out that Jackson and King are cousins.
II. Discussion
A. Sufficiency of the Evidence
A motion for a directed verdict is a challenge to the sufficiency of the evidence. Mainard v. State , 102 Ark. App. 210, 283 S.W.3d 627 (2008). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State, considering only the evidence that supports the verdict, and we will affirm a conviction if substantial evidence exists to support it. Id. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without mere speculation or conjecture. Id.
The State argues that Jackson's challenge to the sufficiency of the evidence supporting his conviction for first-degree murder is not preserved because he addressed only capital murder in his directed-verdict motion. In order to preserve challenges to the sufficiency of the evidence supporting convictions for lesser-included offenses, defendants must address the lesser-included offense either by name or by apprising the trial court of the elements of the lesser-included offenses questioned by their motions for directed verdict. Mainard , supra. Defense counsel made the following directed-verdict motion at trial:
[ DEFENSE COUNSEL ]: Your Honor, the State had listed 23 witnesses. They've called a total of seven witnesses. Of those seven witnesses, I think two maybe had any potential evidence whatsoever. Actually, the only one that had any evidence of any significance would be officer-or Mr. Farrell, previously Detective Farrell. But he stated as to the crimes as charged the only thing he has whatsoever to offer to this Court and to this jury as evidence is that 23-second clip of a silent video.
I mean, he testified he had no knowledge and no evidence of any of the elements of aggravated robbery; as to capital murder, he had no knowledge, no evidence to introduce; as to accomplice liability, he has no knowledge, no information to introduce other than that [tidbit] of a clip of a video. The State's crime lab witnesses offered nothing whatsoever as to any kind of criminal guilt. Your Honor, the only thing, even taking the video as best evidence, that could possibly be proven by what the State's evidence has shown would be theft of a blue bag.
That certainly does not rise to a quantum leap from petit theft to capital murder and aggravated robbery.
Based on those factors, the defense respectfully moves this Court to enter a directed verdict.
The trial court denied the motion, and the defense rested without putting on any evidence. Defense counsel then renewed his directed-verdict motion, stating the following:
[ DEFENSE COUNSEL ]: I would renew my motion that I made at the end of the State's case when they rested, as to lack of evidence for conviction on aggravated robbery or capital murder. And in addition as to accomplice liability, which is under 5-2-403, I just wanted to point some cases out, some excerpts from some cases.... So again I present my motion for directed verdict. It's our position as a matter *59 of law that Mr. Michael Jackson is not an accomplice.
Arkansas Code Annotated section 5-10-101(a)(1)(A)(vi) & (B) (Repl. 2013) provides that a person commits capital murder if, acting alone or with one or more other persons, the person commits or attempts to commit aggravated robbery and, in the course of and in furtherance of the felony or in immediate flight from the felony, the person or an accomplice causes the death of a person under circumstances manifesting extreme indifference to the value of human life. A person commits aggravated robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, the person inflicts death upon another person. Ark. Code Ann. § 5-12-103(a)(1) & (3) (Repl. 2013).
A person commits murder in the first degree if, acting alone or with one or more other persons, the person commits or attempts to commit a felony and, in the course of and in the furtherance of the felony or in immediate flight from the felony, the person or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-10-102(a)(1)(A) & (B).
The difference between the elements of capital murder and first-degree murder, under these particular subsections, is in terms of specificity. The capital-murder statute contains a list of specific felonies the defendant must have committed-here, aggravated robbery-whereas the first-degree-murder statute simply requires a death to have occurred during the commission of "a felony." Although defense counsel did not mention "first-degree murder" in his directed-verdict motion, considering the subsections on which the jury was instructed, the elements of capital murder and first-degree murder are the same. See Jenkins v. State , 350 Ark. 219, 85 S.W.3d 878 (2002) (holding that Jenkins's directed-verdict motion mentioning only capital murder preserved his challenge to the sufficiency of the evidence supporting his conviction for first-degree murder because the elements that the State was required to prove under sections 5-10-101(a)(1) and 5-10-102(a)(1) were identical). Therefore, Jackson's challenge to the sufficiency of the evidence supporting his convictions is preserved.
Jackson argues that the State's entire case hinged on the allegation that he was an accomplice to King. A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person solicits, advises, encourages, or coerces the other person to commit the offense or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense. Ark. Code Ann. § 5-2-403(a)(1) & (2) (Repl. 2013).
Jackson maintains that not a single witness called by the State testified that Jackson and King worked together in any way on June 8, 2016. He states that there was no evidence of phone calls between him and King; no evidence that they arrived at Yuri's home together or that they left the property together; no evidence that they met up after the murder; and no evidence that they were partners in drug activity. Jackson argues that the only evidence the State had was the recording of clips from the surveillance video, which he contends should not have been admitted into evidence. Nevertheless, he claims that all the video clips show is that he and King arrived at Yuri's house within a minute of each other and that something happened, which caused Jackson to return to the home and look inside the door. He contends that, at most, the video clips show *60 that he "had the misfortune of being at the wrong place at the wrong time, which does not equate to accomplice liability."
A person is criminally liable for the conduct of another person when he is the accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402(2). When two persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. Cook v. State , 350 Ark. 398, 86 S.W.3d 916 (2002). A participant cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole. Id. Mere presence at the scene of a crime is not enough to make a person an accomplice. T.D. v. State , 2012 Ark. App. 140, 2012 WL 474326. Except in extraordinary cases, even presence at the scene of the crime, combined with actual knowledge that a crime is being committed, is insufficient to make a person an accomplice in the absence of any purpose to further the accomplishment of the offense. Id. Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in the proximity of a crime, the opportunity to commit the crime, and an association with a person involved in a manner suggestive of joint participation. Id.
The evidence established that Jackson was in the proximity of the crime. The video puts Jackson inside the victim's home shortly before the video tends to establish that Yuri has been killed. The video shows that, after Jackson and King had left the residence, two people approached Yuri's front door and knocked but got no answer and left. Two other people opened the door, stopped at the threshold, abruptly turned, and left. Further, Jackson had the opportunity to aid in the commission of the crime in that he lingered near the home after King had entered the residence, returned to the home quickly, and remained inside the residence with King for a short time. Moreover, Jackson appears to have been associated with King in a manner suggestive of joint participation. The video shows that Jackson and King came from the same direction, albeit at different times; Jackson, who had already been inside the home, held the door open for King to enter Yuri's residence; Jackson slowly walked away from the home while glancing back at the residence; Jackson quickly returned to the residence and used his shirt to open the door; Jackson and King were inside Yuri's residence for a short time; Jackson used his shirt to both open and close the door on his way out; Jackson ran from the house carrying Yuri's bag; and Jackson and King ran in the same direction from which they had come. Viewing this evidence in the light most favorable to the State and considering only the evidence that supports the verdict, we hold that there was substantial evidence to support Jackson's convictions.
B. Admissibility of Evidence
It is well settled that evidentiary matters regarding the admissibility of evidence are left to the sound discretion of the trial court, and rulings in this regard will not be reversed absent an abuse of discretion. Grant v. State , 357 Ark. 91, 161 S.W.3d 785 (2004). Abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration. Id.
At the hearing on Jackson's motion in limine, Amber, the victim's sister, testified that Yuri had a surveillance system because his house had been broken into in the past. She said that he had had the system for about three or four years. Amber *61 stated that the system, which did not have audio capabilities, had a recording function and that Yuri would play back the video to see "who all came over, you know, like when he gone and come back." Amber said that Yuri's system was "always on," that it "always worked," and that Yuri "never had any problems out of it." She said that she saw herself on the monitor inside the house on the day that she found her brother dead. She said that the surveillance video accurately represented what she saw that day and clarified that it did not show her actions inside the house.
Farrell testified that, when he responded to the scene, he noticed a camera pointed at the victim's front door. Inside the home was a DVR and monitor with a live feed depicting him and the other officers and EMTs on the scene. Farrell said that he opened the system, which was not password protected, and that, although the time and date from the surveillance video were incorrect, he went to the last few scenes where it showed the police and EMTs on the scene and then he "basically backtrack[ed]" until he found a timeline of the events that began when Yuri arrived home on the day of his murder. Farrell stated that
[m]ost DVRs are set up where you can put a jump or a thumb drive, a USB device, into it and then pick out the time and date that you wish to copy to it. And almost all of them I've ever seen will copy that footage, and then put some sort of player or have the footage as a readable format where you can view through a common player like [Windows] Media [Player] or something like that. I was unable to do that [with Yuri's system].
Farrell testified that to preserve the surveillance video, he used a camcorder to record the footage as it played from Yuri's system. He recorded the footage in segments, or clips, to expedite the process and recorded anyone who went to Yuri's front door between the time of Yuri's arrival home and the medical and law-enforcement personnel's arrival on the scene. Farrell said that Yuri was wearing the same clothes on the video as he was when he was later found dead. He also said that the video showed a Coke bottle in Yuri's hand as he entered the residence and that he later found a Coke bottle near Yuri's body.
In denying Jackson's motion in limine, the trial court stated that an adequate foundation had been laid by the witnesses to authenticate the recording of the surveillance-video clips. The trial court noted that, although the recording was not the original, a copy of the original is permissible and that, here, its admission was not unfair to Jackson. The trial court pointed out that the recording of the surveillance video was not conclusive on the matter portrayed, that the jury would decide its weight and credibility, and that defense counsel would be given latitude in cross-examining the foundational witnesses.
The admissibility of photographic evidence is based on two different theories. Colston v. State , 2017 Ark. App. 282, 523 S.W.3d 363. One theory is the "pictorial testimony" theory. Id. Under this theory, the photographic evidence is merely illustrative of a witness's testimony, and it becomes admissible only when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness's personal observation. Id. A second theory under which photographic evidence may be admissible is the "silent witness" theory. Id. Under that theory, the photographic evidence is a "silent witness," which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness.
*62 Id. Here, the State argued that the recording of clips from the surveillance video was admissible under the "silent witness" theory.
Arkansas Rule of Evidence 901(a) provides that the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. One example of authentication or identification conforming with the rule's requirements is testimony of a witness with knowledge that a matter is what it is claimed to be. Ark. R. Evid. 901(b)(1). A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity or continuing effectiveness of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original. Ark. R. Evid. 1003.
Jackson argues that "[w]e have a diced and spliced, cut and paste video of a video created by the detective investigating the case, not even an actual duplicate of the original, because the detective and our state crime [lab] were not able to figure out how to make a copy of the actual original recording." He asserts that the video's date and time stamp were wrong; there was no audio with the video[1] ; the video was not a continuous stream; and the only person who could authenticate the system's reliability was the victim, who is deceased.[2] He argues that the foundational witnesses could not testify that they saw either Jackson or King enter Yuri's residence on June 8, 2016, and that the most they were able to do was identify Jackson and King as being two of several people seen on the video. Jackson asserts that this court should give "due consideration" to decisions on this issue from other states. Moreover, he argues that admitting the video was prejudicial and not harmless error because the State otherwise had no case and the jury could not have convicted him of either offense.
The trial court found that the witnesses adequately established the authenticity of the recording and that admitting what was essentially a duplicate of the surveillance video was not unfair to Jackson. We cannot say that the trial court abused its discretion in admitting this evidence. The issues complained of by Jackson, such as the surveillance video's having an incorrect date and time stamp and having no audio, went to the weight of the evidence rather than its admissibility.
Affirmed.
Abramson and Hixson, JJ., agree.

Ark. R. Evid. 901(b)(5).

Ark. R. Evid. 901(b)(9).