Cite as 2025 Ark. App. 194

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CR-24-413

| | | |
|---|---|---|
| JOEL WILLIAMS | APPELLANT | Opinion Delivered April 2, 2025 |
| | | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47BCR-21-138] |
| V. | | |
| STATE OF ARKANSAS | APPELLEE | HONORABLE SCOTT A. ELLINGTON, JUDGE |
| | | AFFIRMED |

**CASEY R. TUCKER, Judge**

At the conclusion of a three-day jury trial, Joel Williams was convicted as a habitual offender of first-degree murder and committing a terroristic act in concert with two or more other people, and he received a five-year enhancement for using a firearm in the commission of these crimes. Following the jury's recommendation, the Mississippi County Circuit Court sentenced him to twenty years' imprisonment for the murder conviction and fifteen years' imprisonment for the terroristic-act conviction. With the five-year firearm enhancement and the consecutive sentences, Williams received a total of forty years' incarceration in the Arkansas Division of Correction.[1] He raises five points on appeal, asserting that the circuit

---

[1]The State notes that the sentencing order contains a scrivener's error. The original order does have an error; however, the court entered an amended order that corrects that error.

court erred in denying his motion for directed verdict, denying his *Batson* challenge, denying his motion for a mistrial, refusing to instruct the jury with AMI Crim. 2d 603, and requiring Williams and his codefendants to wear ankle monitors at trial. We affirm.

When reviewing a challenge to the sufficiency of the evidence to support a conviction, this court views the evidence in the light most favorable to the State and considers only that evidence that supports the verdict. *Brooks v. State*, 2024 Ark. App. 241, 687 S.W.3d 397. Applying the proper perspective to our review of the case before us, the following events unfolded on the afternoon of April 7, 2021, in Blytheville, Arkansas.[2] Shortly after 4:00 p.m., Williams and codefendants Tyree Johnson and Willvontae Westmorland, together in one car, drove down Walls Street, turned left on Myrtle Street, and parked between two houses that faced Walls Street. They backed into their parking spot between two houses. None of the three lived in either of the houses between which they parked. The three men exited the vehicle, leaving the doors open; retrieved various firearms, including an assault rifle; and milled around in the area of the car.

Approximately three minutes later, a black BMW driven by Jamion Sims came down Walls Street. When it was in front of the house behind which Williams and his cohorts had parked, the BMW slowed, and four armed men began rolling and jumping out of the car. Williams, Johnson, and Westmorland ran toward the men who had exited the BMW. A gunfight ensued as the BMW continued slowly down the street. The men from both sides

---

[2]In addition to testimony, the evidence included surveillance video from multiple security cameras in various locations.

were running, dodging, and ducking as they fired. The men from the BMW ran toward it and began getting back inside the car as it slowly drove away from the scene. As they did so, the men in Williams's group continued firing.

Everything came to a halt when Lieutenant Michael Dannar of the Blytheville Police Department, rammed his police cruiser into the BMW. After he detained three of the shooters from the BMW, one of the men informed him that the driver had been shot. Lieutenant Danner found the driver slumped over the steering wheel with a gunshot wound to his head. Even though the shootout had lasted less than one minute, the police recovered seventy-three shell casings from the scene.

The BMW's driver, Sims, was the only fatality from the gunfight that took place that day. Mr. Sims had never exited the car; however, there was a handgun on the floorboard by his feet. He died from a single gunshot wound to his head. It entered from the left, behind his ear, and exited to the right, with a slightly front-to-back trajectory. The medical examiner testified that the shot was fired from a distance greater than three feet. The direction the car was traveling placed Williams and his associates on the driver's side of the BMW during the exchange. There were concentrated groups of shell casings: forty-four of the seventy-three casings were found in the area where Williams, Johnson, and Westmorland had been during the shootout. Williams and his associates fled the scene when law enforcement arrived. Officers identified them from the multiple surveillance videos in the area, and they were arrested.

Williams, Johnson, and Westmorland were tried together in a jury trial in January 2024.[3] The jury found Williams and his codefendants guilty of first-degree murder, committing a terroristic act, and using a firearm in the commission of these crimes. The court sentenced Williams to a total of forty years' imprisonment in accordance with the jury's recommendation, and Williams timely appealed.

## I. *Sufficiency of the Evidence*

Williams argues on appeal that his convictions are not supported by sufficient evidence because (1) the State did not prove who fired the fatal shot, and (2) the State failed to negate his justification defense. We disagree.

When reviewing a challenge to the sufficiency of the evidence, we consider only that evidence that is favorable to the State and supports the verdict. *Brooks v. State*, 2024 Ark. App. 241, at 4, 687 S.W.3d 397, 400. We will affirm if substantial evidence supports the judgment of conviction. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.* We defer to the jury on matters of witness credibility. *Id.* Jurors may consider the evidence as a whole rather than view each fact in isolation. *Id.*

---

[3]Johnson and Westmorland appeal their convictions in separate appeals also handed down today. *See Johnson v. State*, 2025 Ark. App. 198, ___ S.W.3d ___; *Westmorland v. State*, 2025 Ark. App. 196, ___ S.W.3d ___.

## A. Causation

Willams asserts that pursuant to *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 218, the State was required to prove that but for Williams's actions, Sims would not have died. Thus, his argument goes, since the State cannot prove which bullet pierced Sims's skull and from which firearm that bullet was fired, there is insufficient evidence to support Williams's murder conviction. We are not persuaded by *Anderson*, *supra*, as it is not an accomplice-liability case. Williams's analysis ignores the law of accomplice liability.

Williams was convicted of felony murder, which requires the State to prove the following:

(1) Acting alone or with one (1) or more other persons:

(A) The person commits or attempts to commit a felony; and

(B) In the course of and in the furtherance of the felony or in immediate flight from the felony, the person or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life[.]

Ark. Code Ann. § 5-10-102(a) (Repl. 2024). The underlying felony for Williams's murder conviction was committing a terroristic act, which a person commits if, "while not in the commission of a lawful act, the person . . . [s]hoots at or in any manner projects an object at a conveyance which is being operated or which is occupied by another person with the purpose to cause injury to another person or damage to property[.]" Ark. Code Ann. § 5-13-310(a)(1) (Repl. 2024). A person acts purposely with respect to his conduct when it is his conscious object to engage in conduct of that nature or to cause that result. Ark. Code Ann. § 5-2-202(1) (Repl. 2024).

5

The State was not required to prove Williams shot the bullet that killed Sims. The States's theory in this case was that the codefendants were accomplices. This court explained accomplice liability in *Jackson v. State*, 2018 Ark. App. 330, at 7–8, 552 S.W.3d 55, 60:

> A person is criminally liable for the conduct of another person when he is the accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402(2). When two persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). A participant cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole. *Id.* . . . Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in the proximity of a crime, the opportunity to commit the crime, and an association with a person involved in a manner suggestive of joint participation. *Id.*

The law in Arkansas makes no distinction between the criminal liability of a principal and an accomplice. *Winters v. State*, 2013 Ark. 193, 427 S.W.3d 597. A defendant can be found guilty of his own conduct and that of an accomplice, and when multiple people participate in the commission of a crime, each is an accomplice and criminally liable for the conduct of all. *Id.*

Viewing causation through the lens of accomplice-liability law, multiple defendants can be found guilty of causing an individual's death when they act together to cause it—even if the death is the result of a single gunshot, as in the present case. Williams and his codefendants all actively participated in the gunfight that resulted in Sims's death.

The video evidence produced at trial shows that Williams and his codefendants arrived together in one car at the area of the shootout minutes ahead of the BMW driven by Sims. They parked their car behind a house facing Walls Street and proceeded to arm

themselves. When Sims drove the BMW down Walls Street and slowed in front of the same house, Williams and his two cohorts ran from behind the house with their weapons drawn. As men fell and jumped out of the BMW with their guns also drawn, Williams and his cohorts opened fire, as did the men who exited the BMW. The video evidence shows Williams and his codefendants acted together as they fired their guns in the direction of the BMW, while the men who exited the BMW fired back toward the defendants.

During the fray, a bullet struck Sims's head. The evidence showed that the bullet was fired from more than three feet away and entered Sims's head from the left side. Williams and his codefendants were on the left side of the BMW and were firing toward the BMW from a distance. The men who had arrived in the BMW were firing toward Williams's group and away from the BMW. Clearly, sufficient evidence supports the conclusion that the defendants, while acting in concert, fired their weapons toward and into the BMW, killing Sims "under circumstances manifesting extreme indifference to the value of human life." *See* Ark. Code Ann. § 5-10-102(a)(1).

"'[T]here is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned.' *Price v. State*, 2019 Ark. 323, at 5, 588 S.W.3d 1, 5. When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both." *Lester v. State*, 2024 Ark. App. 206, at 10, 687 S.W.3d 344, 353. In the present case, Williams participated equally with his accomplices and thus was criminally liable for his own acts *and theirs*. It does not matter who fired the fatal shot. *See Purifoy v. State*, 301 Ark. 482, 492, 822 S.W.2d 374, 379 (1991)

7

("Since appellant bases his causation argument solely on the erroneous proposition that he cannot be held liable for his accomplice's actions, we find no evidence to support a causation instruction."). "In cases implicating a theory of accomplice liability, we will affirm if there is substantial evidence that the defendant acted as an accomplice in the commission of the alleged offense." *Bethune v. State*, 2025 Ark. App. 107 at 8. Substantial evidence supports the conclusion that Williams and his codefendants acted as accomplices in committing the crimes of which they were convicted.

## B. Justification

Williams argues on appeal that he was acting in self-defense when he participated in the gunfight that resulted in Sims's death. In doing so, he claims that the State failed to present substantial evidence disproving his justification defense beyond a reasonable doubt. We disagree.

This court explained the justification defense and the appropriate application of the standard of review in such cases in *Brown v. State*, 2020 Ark. App. 198, at 4–5, 595 S.W.3d 456, 459:

> Arkansas Code Annotated section 5-2-607(a)(2) (Supp. 2019) provides that a person is justified in using deadly force upon another person if the person reasonably believes that the other person is using or is about to use unlawful deadly physical force. The State must prove each element of an offense, Ark. Code Ann. § 5-1-111(a)(1) (Repl. 2013), and whether circumstances negate a defendant's excuse or justification for the conduct is an element of the offense. Ark. Code Ann. § 5-1-102(5)(c) (Repl. 2013). When reviewing the sufficiency of the State's negation of a justification defense, we employ the substantial-evidence standard of review. *Gillard v. State*, 2019 Ark. App. 438, 586 S.W.3d 703.

8

> Whether one is justified is largely a matter of the defendant's intent and is generally a factual question for the jury. *Kauffeld v. State*, 2017 Ark. App. 440, at 9, 528 S.W.3d 302, 309.

"A person may not use deadly physical force in self-defense if he knows that he can avoid the necessity of using that force with complete safety by retreating. Additionally, this defense is not applicable when one arms himself and goes to a place in anticipation that the other will attack him. *Kemp v. State*, 348 Ark. 750, 74 S.W.3d 224 (2002)." *Douglas v. State*, 2018 Ark. 89, at 7, 540 S.W.3d 685, 689. The jury is not required to put aside common sense and need not view each fact in isolation but may consider the evidence as a whole. *Bailey v. State*, 2016 Ark. App. 209, 489 S.W.3d 203.

Williams asserts that he could not safely retreat and thus was justified in using deadly force. Based on the evidence as a whole, Williams and his accomplices arrived at the scene of the gunfight before the BMW containing the other participants, including the victim. Williams and his accomplices parked (hid) behind a house fronting Walls Street and got their guns ready. After lying in wait for the BMW, Williams and his accomplices ran toward the BMW and opened fire. There was testimony that, based on the videos, Williams's side was the first to fire. Finally, as the BMW drove away from the scene, Williams and his cohorts continued to advance, firing their weapons toward the car.

The jury was instructed on self-defense but chose not to accept it. Substantial evidence supports the State's negation of Williams's justification defense.

II. *Batson Challenge*

9

Williams argues on appeal that the circuit court erred in denying his *Batson* challenge. We disagree.

A prosecutor generally may exercise peremptory challenges on any basis related to the outcome of the case. However, he or she may not use peremptory challenges to strike potential jurors on the basis of their race alone under the assumption that black jurors would be unable to impartially consider the State's case against a black defendant. *Batson v. Kentucky*, 476 U.S. 79 (1986). Striking jurors on the basis of race alone is a violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.*

This court explained the process for raising and addressing Batson challenges in *Severance v. State*, 2024 Ark. App. 87, 684 S.W.3d 610. First, the opponent of the strike must make a prima facie case by showing "(1) that the strike's opponent is a member of an identifiable racial group, (2) that the strike is part of a jury-selection process or pattern designed to discriminate, and (3) that the strike was used to exclude jurors because of their race. In deciding whether a *prima facie* case has been made, the trial court should consider all relevant circumstances." *Id.* at 20, 684 S.W.3d at 623. Once the opponent has made a prima facie case, the State must give a racially neutral reason for the strike. The State's explanation

> must be more than a mere denial of discrimination or an assertion that a shared race would render the challenged juror partial to the one opposing the challenge. Under *Purkett*, this explanation need not be persuasive or even plausible. Indeed, it may be silly or superstitious. The reason will be deemed race neutral '[u]nless a discriminatory intent is inherent in the prosecutor's explanation.' *Purkett* [*v. Elem*], 514 U.S. [765,] 768 [(1995)].

10

*Id.* at 20–21, 684 S.W.3d at 623. The third and final step is for the court to decide whether the proponent's reason for the strike is pretextual. *Id.* At this point, if the strike proponent has given a race-neutral reason for the strike, it is incumbent on the opponent of the strike to persuade the circuit court that the expressed motive is pretextual rather than genuine. It is crucial that the trial court weighs and assesses what has been presented to it to decide whether in light of all the circumstances, the proponent's explanation is or is not pretextual. *Id.*

On appeal, this court will reverse the circuit court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Travis v. State*, 371 Ark. 621, 628, 269 S.W.3d 341, 346 (2007). In our review, we give deference to the circuit court because it is in a superior position to make determinations of juror credibility. *Id.*; *see also Severance, supra.*

In the present case, the following exchange took place between the prosecutor and the potential juror during voir dire:

| | |
|---|---|
| PROSECUTOR: | What about you, Mr. Wilson? If we prove the elements of the case beyond a reasonable doubt, could you find the defendants guilty? |
| PROSPECTIVE JUROR: | If I have to, yes. |
| PROSECUTOR: | You say if you have to, yes. What does that mean? |
| PROSPECTIVE JUROR: | I don't know. |
| PROSECUTOR: | Is it kind of like, I really don't want to have to do this, but if I got to do this — |

| | |
|---|---|
| PROSPECTIVE JUROR: | Yeah. |
| PROSECUTOR: | Gotcha. But again, let's say you make the jury. And let's say, hey, you're charged with making that decision. If we prove the case beyond a reasonable doubt, could you find them guilty? |
| PROSPECTIVE JUROR: | Probably. |
| PROSECUTOR: | Probably? Could you do it? If we make our case beyond a reasonable doubt, could you find them guilty? |
| PROSPECTIVE JUROR: | Mm-hmm. |

The State used a peremptory strike to excuse Mr. Wilson, and the defense challenged the strike as not being based on a race-neutral reason. The State asserted that it was striking Mr. Wilson because he waffled on whether he could follow the law and find the defendants guilty. The lead prosecuting attorney also noted for the record that he (the prosecutor) is African American. After hearing from both sides, the circuit court consulted the notes it had made during voir dire and stated, "[H]e is not excited about being here," and it also noted that Mr. Wilson was from Oklahoma City. The court then found that the State had given a race-neutral reason for the strike and excused Mr. Wilson from the jury. After making the race-neutral determination and stating that it was excusing Mr. Wilson, the court remarked, "And, Mr. Walker is, in fact, African American and the lead prosecutor of this case."

We do not find that the circuit court's finding was clearly against the preponderance of the evidence. The State gave a race-neutral reason for the strike, which the court

12

considered in addition to consulting its own notes. After considering what was presented to it, the court decided that the State had given a race-neutral reason for the strike.

Williams also argues that it was error for the court to consider the lead prosecutor's race in making its *Batson* determination. The argument is not preserved for appeal because none of the defendants raised it before the circuit court. We do not consider arguments raised for the first time on appeal. *Parret v. State*, 2022 Ark. App. 234, 644 S.W.3d 472. Even if this argument were preserved for appeal, it is without merit. The court's ruling was based on the State's race-neutral reason for the strike, and it did not acknowledge the prosecutor's comment about his race until after making its ruling.

### III. *Motion for Mistrial*

Williams asserts that the circuit court erred in denying his motion for a mistrial on the basis that the State used factually contradictory theories to secure convictions against the defendants in this case and the defendants who were the men riding in the BMW. He argues that the State is judicially estopped from pursuing contradictory positions and that to allow otherwise is a due-process violation. Williams's argument is without merit.

The basis for the motion was the prosecutor's statement in his closing argument that when the defendants started the gunfight, the driver of the BMW—the victim—and his passengers were not doing anything wrong. And yet, simultaneously, the State was prosecuting the BMW occupants for Sims's murder.

A mistrial is an extreme remedy and should be granted only "when there has been an error so prejudicial that justice cannot be served by continuing the trial." *Richmond v. State*,

302 Ark. 498, 502, 791 S.W.2d 691, 693 (1990). The standard of review on appeal is abuse of discretion, and we will not reverse absent abuse of that discretion. *Id.* The circuit court did not abuse its discretion in denying the motion for mistrial in the present case.

The use of "inherently factually contradictory theories" violates due process when the State is prosecuting multiple defendants for the same crime. *Smith v. Groose*, 205 F.3d 1045, 1052 (2000). However, until the other perpetrators are tried, there is no theory for the State to contradict. *Green v. State*, 2012 Ark. 347, 423 S.W.3d 62.

In the present case, though the passengers in the BMW were charged with Sims's murder, they had not yet been tried at the time of Williams's trial. Thus, there was no existing theory for the State to contradict in its closing argument. Moreover, the State's statement that, at the time that Williams and his cohorts charged the car while firing, the passengers were not doing anything wrong, was not contradictory of the passengers' guilt due to their later actions. Williams and his codefendants as well as the four surviving passengers of the BMW all participated in a modern-day version of the gunfight at the O.K. Corral. Prosecuting all participants for Sims's murder is not contradictory. Unlike the prosecution in *Smith*, *supra*, the State in the present case did not make contradictory arguments or manipulate facts or evidence to obtain multiple convictions.

The circuit court did not abuse its discretion by denying the motion for a mistrial.

IV. *Proffered Jury Instruction on Causation*

Williams asserts that the circuit court erred by refusing to give AMI Crim. 2d 603, the jury instruction on causation. A circuit court's decision to reject a proffered instruction

14

will not be reversed unless the court abused its discretion and by so doing caused prejudice. "Abuse of discretion is a high threshold that does not simply require error in the trial judge's decision but requires that the trial judge acted improvidently, thoughtlessly, or without due consideration. Additionally, absent a showing of prejudice, we will not reverse." *Finfrock v. State*, 2017 Ark. App. 90, at 2, 524 S.W.3d 483, 484. "In determining whether the trial court erred in refusing an instruction in a criminal trial, the test is whether the omission infects the entire trial such that the resulting conviction violates due process. *Hickman v. State*, 372 Ark. 438, 277 S.W.3d 217 (2008); *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002)." *Bell v. State*, 2014 Ark. App. 458, at 3. We do not find that the circuit court acted "improvidently, thoughtlessly, or without due consideration" or that the entire trial was infected by the refusal of AMI Crim. 2d 603 to the degree that Williams's conviction violated due process.

AMI Crim. 2d 603 states: "Causation exists when the result would not have occurred except for the conduct of [defendant] operating either alone or together with another cause, unless the other cause was clearly sufficient to produce the result, and the conduct of [defendant] was clearly sufficient by itself." The circuit court considered the requested instruction, stating:

> Four other defendants charged with the same death and, as Mr. Davis has mentioned more than once, they're all accomplices in the commission of a terroristic act, shooting into or from a vehicle, and so, certainly, there's maybe aggravated assault, but it still falls under the felony murder rule in that -- I mean, they all showed up to have a gunfight.

15

So, I think that's what the proof has been so far, and just because your clients participated and were there, and it appears from the videos, willing participants in that – I mean, I don't want to cloud this up anymore.

The court and the parties previously had agreed that in light of the video evidence,

AMI Crim. 2d 401 concerning accomplice liability would be given. Instruction 401 states:

In this case, the State does not contend that the defendants each acted alone in the commission of the offenses charged. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense.

An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense: Solicits, advises, encourages, or coerces the other person to commit the offense; or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.

Purpose. A person acts with purpose with respect to his conduct or result thereof when it is his conscious objective to engage in conduct or the nature or cause such a result.

As reasoned by the court, multiple defendants were charged with Sims's death.

Pursuant to accomplice-liability law, the State was not required to prove who fired the fatal

shot. Giving AMI Crim. 2d 603 would have confused that point of law. As explained in

*Purifoy*, 301 Ark. at 492, 822 S.W.2d at 379, "since appellant bases his causation argument

solely on the erroneous proposition that he cannot be held liable for his accomplice's actions,

we find no evidence to support a causation instruction."

The circuit court's refusal to give AMI Crim. 2d 603 was not an abuse of discretion.

V. *Ankle Monitor*

Williams's fifth point on appeal is that the circuit court abused its discretion in

requiring him and his codefendants to wear ankle monitors in trial. He argues that wearing

16

the ankle monitor signaled to the jury that he was so dangerous he needed to wear an ankle monitor even when in a court of law and surround by law enforcement officers. Williams cites Rule 33.4, providing that a defendant "shall not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order." Ark. R. Crim. P. 33.4 (2024).

At the pretrial hearing, Williams's defense counsel stated, "I just have one last thing, as a housekeeping issue. All the Defendants are currently wearing ankle monitoring. We were discussing a way, the day of trial, to not have ~ exposed the fact that they are on ankle monitoring. I don't know if they came up with a solution." The circuit court responded that the defendants should wear long pants and/or bell bottoms. The trial court commented that it was obvious the defendants were in street clothes, and due to the arrangement of the courtroom, he did not think the monitors would be an issue like cuffs and chains. The prosecuting attorney stated that he could not even see two of the defendants' monitors. The circuit court asked counsel whether they had any authority supporting their argument that wearing ankle monitors would prejudice the jury. Williams's and Westmorland's attorneys stated they had no such authority. The court noted that the defendants were out on bond and in street clothes and again recommended wearing pants that would prevent the monitors from being noticed.

On appeal, Williams relies on cases that involve requiring defendants to attend trial in prison garb or physical restraints. He presents no authority that an ankle monitor is a "physical restraint" governed by Rule 33.4. We do not consider arguments when an

17

appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. *Britton v. State*, 2014 Ark. 192, at 11, 433 S.W.3d 856, 863.

It is not prejudicial per se for a defendant to appear at trial in restraints. *Id.* And there is no evidence in the record that the jury could see Williams's ankle monitor or knew that he was wearing one. Therefore, Williams has failed to show how he was prejudiced at trial by wearing an ankle monitor. Accordingly, we hold that the circuit court did not abuse its discretion by requiring the defendants to wear ankle monitors.

Affirmed.

WOOD and MURPHY, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.