Cite as 2019 Ark. App. 578

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR-19-251

| | | |
|---|---|---|
| MARKELL JIMMERSON | | **Opinion Delivered:** December 4, 2019 |
| | APPELLANT | |
| | | APPEAL FROM THE ST. FRANCIS COUNTY CIRCUIT COURT [NO. 62CR-15-43] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE CHRISTOPHER W. MORLEDGE, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**MIKE MURPHY, Judge**

Appellant Markell Jimmerson was convicted by a St. Francis County Circuit Court jury of one count of first-degree murder, one count of manslaughter, one count of possession of a controlled substance with purpose to deliver (Xanax), one count of possession of a defaced firearm, and one count of simultaneous possession of drugs and firearms.[1] In accordance with the jury's recommendation, the circuit court sentenced Jimmerson to serve ninety-two years in the Arkansas Department of Correction. On appeal, Jimmerson argues the evidence was insufficient to support four of his five convictions, that the circuit court erred by denying his motion to suppress his custodial statement, and that the circuit court erred by denying his motions for a mistrial. We affirm.

---

[1]Jimmerson was charged with two counts of capital murder but was convicted under the lesser-included offenses. In addition to the charges he was convicted of, he was also charged with driving while intoxicated.

## I. *Procedural Facts and History*

In the early morning hours on December 25, 2014, police responded to a call about a suspicious vehicle. An officer arrived on the scene and located a white Chevrolet SUV. As he approached the vehicle, he saw two males who were unresponsive and had what appeared to be fatal wounds to their heads. The victims were identified as thirty-eight-year-old Kendrick Smith and forty-two-year-old Gary Thomas. Smith was in the driver's seat and Thomas was in the front passenger seat.

About three hours later, the Forrest City Police Department dispatched units in reference to a vehicle in a ditch, and the occupant was reported to have a gun. Jimmerson was found passed out in the driver's seat of that vehicle. Officers located a handgun laying on the passenger seat and a pill bottle in Jimmerson's pocket containing thirty-two Xanax. Jimmerson was pulled out of the vehicle and taken into custody.

Roughly fifteen hours after having been taken into custody, police interviewed Jimmerson. He agreed to speak with the detectives and executed a written waiver of his *Miranda* rights. Jimmerson initially denied any involvement with the homicides but eventually stated what happened. He explained that he told Smith he was trying to sell some Xanax, so Smith told him to get in the SUV with him and Thomas. Jimmerson stated that after the men had ridden around for a while, Thomas demanded the pills for cheaper than what Jimmerson was asking. Jimmerson said he tried to exit the vehicle, but Thomas grabbed him by his shirt and told him, "N★★★★ I'll blow your mother★★★★★★ brains out." Jimmerson said his first response was to pull his gun out and fire several shots. He explained that he did not intend to shoot Smith and that it was an accident.

2

Jimmerson filed a pretrial motion to suppress the statement he gave officers on the night of the incident. Following a hearing, the circuit court denied Jimmerson's motion.

At the jury trial, Jimmerson asserted that he shot Thomas in self-defense because he suffered from PTSD, and he believed Thomas had a weapon and intended to harm him. Jimmerson asserted that he accidently shot Smith. The State's witness, Dr. Lacy Matthews, a forensic psychologist at the Arkansas State Hospital, testified that she performed a court-ordered evaluation on Jimmerson in August 2016, and she found him to be competent. Her testimony also included background information on Jimmerson. She testified that Jimmerson had been purchasing Xanax off the street to self-medicate his anxiety from having previously been shot. But when she went through her review of questions during the examination, she testified that Jimmerson did not identify any other worries or concerns about anything other than his current legal situation. She admitted that she did not specifically go back and ask him about previously being shot. Because he did not report any symptoms of PTSD other than anxiety and considering the rest of her evaluation, Dr. Matthews opined that Jimmerson did not suffer from PTSD.

The defense's witness, Dr. James Moneypenny, a psychologist in private practice, testified that he has evaluated several veterans and other persons who have PTSD. He testified that he evaluated Jimmerson and that his opinion was that Jimmerson suffers from PTSD. Dr. Moneypenny went through the criteria and explained that he diagnosed Jimmerson on the basis of the following: Jimmerson suffered two life-threatening events because he had been shot at twice; he suffered from intrusive symptoms because Jimmerson reported it was on his mind all the time; and he avoided triggering situations—for example,

3

he did not go around his child's mother because he knew the guy that made the threat against him would be around. He further testified that because he met the criteria, the PTSD would interfere with his decision-making process. Dr. Moneypenny stated that he believed that is what was occurring when he was faced with a deadly threat from Thomas. He admitted there was probably some overlap between his disturbances and the ingestion of drugs and alcohol but that the substances would not necessarily have caused him to feel more or less fear in his life.

When Dr. Moneypenny was specifically asked about the incident, he testified that Jimmerson perceived he was in danger because he said Thomas made a move and Jimmerson thought he was pulling out a gun. Dr. Moneypenny stated, "[H]is perception is what this is all about." He also testified that Jimmerson said that the shooting was an accident, and he did not know how Thomas specifically got shot in the back of the head.

At the conclusion of the trial, the jury found Jimmerson guilty of first-degree murder in the death of Thomas and guilty of manslaughter in the death of Smith. The jury also found Jimmerson guilty of possession of a controlled substance with purpose to deliver (Xanax), possession of a defaced firearm, and simultaneous possession of drugs and firearms. He was sentenced to ninety-two years' imprisonment and now appeals.

II. *Discussion*

A. Sufficiency of the Evidence

The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Terrell v. State*, 2019 Ark. App. 433, at 5–6, 587 S.W.3d 594, 599. Substantial evidence is evidence of sufficient certainty

4

and precision to compel a conclusion one way or the other and pass beyond mere suspicion or conjecture. *Id.* In reviewing the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.*

## 1. *First-degree murder*

A person commits murder in the first degree if with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5-10-102(a)(2). A person acts purposely with respect to his conduct or a result of his conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). It is axiomatic that one is presumed to intend the natural and probable consequences of his or her actions. *Stearns v. State*, 2017 Ark. App. 472, at 5, 529 S.W.3d 654, 657.  A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Id.*

First, Jimmerson challenges his first-degree-murder conviction arguing there was insufficient evidence to prove he purposely caused Thomas's death. He asserts the evidence showed that his only purpose in firing the weapon at Thomas was to evade a dangerous life-threatening situation.

The evidence established that Thomas died from two gunshot wounds to his head. The medical examiner who performed the autopsy testified that Thomas was shot from behind right below his ear and on his scalp. The firearm-and-toolmark examiner testified that he received the three bullet fragments from Thomas's brain, and he was able to identify

5

two of the fragments as having been fired from the pistol recovered from Jimmerson.[2] Jimmerson also admitted that he shot his gun in order to leave the car because a disagreement was starting to erupt with Thomas. He then fled the scene. The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Terrell*, 2019 Ark. App. 433, at 6, 587 S.W.3d at 600. This evidence, when taken as a whole and examined in the light most favorable to the State, was sufficient for the jury to conclude without resorting to speculation that Jimmerson acted with the purpose of causing the death of Thomas.

Jimmerson relies on Dr. Moneypenny's testimony that his startled response to the threat of deadly force from Thomas overwhelmed his ability to process what was going on, causing him to experience "tunnel vision." However, Dr. Matthew's testimony contradicted Dr. Moneypenny's testimony, and she disagreed with his PTSD diagnosis and analysis. The weight of the evidence and the credibility of the witnesses are matters for the fact-finder, not for this court on appeal. *Dulle v. State*, 2019 Ark. App. 378, at 4, 582 S.W.3d 28, 30. The jury may believe all or part of any witness's testimony and is responsible for resolving questions of conflicting testimony and inconsistent evidence. *Id.* Viewing the evidence in the light most favorable to the State, Jimmerson's first-degree-murder conviction is supported by substantial evidence.

Next, Jimmerson argues the State failed to disprove his justification defense beyond a reasonable doubt. He asserts the jury was left to speculate because there was no evidence contradicting his statement that Thomas was the initial aggressor.

---

[2]The third fragment was inconclusive and could be neither identified nor eliminated.

Arkansas Code Annotated section 5-2-607(a)(2) (Supp. 2017) provides that a person is justified in using deadly force upon another person if the person reasonably believes that the person is using or is about to use unlawful deadly physical force. The State must prove each element of an offense, Ark. Code Ann. § 5-1-111(a)(1) (Repl. 2013), and whether circumstances negate a defendant's excuse or justification for the conduct is an element of the offense. Ark. Code Ann. § 5-1-102(5)(c) (Repl. 2013). When reviewing the sufficiency of the State's negation of a justification defense, we employ the substantial-evidence standard of review. *Gillard v. State*, 2019 Ark. App. 438, 586 S.W.3d 703.

Substantial evidence supports the jury's verdict that the State negated Jimmerson's claim of justification. The evidence established that there was no other weapon found in the car with Thomas; Thomas was shot in the head from behind; Jimmerson immediately fled the scene; and in his interview with law enforcement, Jimmerson admitted it was his immediate reaction to shoot in response to Thomas's grabbing him. Justification is a question of fact for the jury to resolve, *Moody v. State*, 2014 Ark. App. 538, 444 S.W.3d 389, and here the jury could reasonably reject Jimmerson's justification defense on the basis of the evidence presented at trial.

2. *Possession of a controlled substance with purpose to deliver*

Jimmerson was charged with possession of a controlled substance with purpose to deliver under Arkansas Code Annotated § 5-64-432 (Supp. 2013). On appeal, he argues there was insufficient evidence to support the element of "purpose to deliver." To support his argument, Jimmerson asserts there was no evidence that he actually followed through

with the sale. He contends that the evidence thus established that the pills were instead for personal consumption rather than for any purpose to deliver.

The plain language of the statute requires only having a "purpose" to deliver, not actual delivery. The jury could infer that had the price been right, Jimmerson would have sold the pills. The trier of fact resolves the questions of conflicting testimony, inconsistent evidence, and credibility. *King v. State*, 2014 Ark. App. 81, at 2, 432 S.W.3d 127, 129. Furthermore, purpose to deliver can be shown by statutory factors, including the possession of a firearm at the time of the possession of the controlled substance, which Jimmerson had. Ark. Code Ann. § 5-64-432(a)(4).

### 3. *Simultaneous possession*

Next, Jimmerson argues that without sufficient proof of the underlying felony-drug offense, there can be no conviction for simultaneous possession. However, because we hold substantial evidence supports the jury's finding that he committed a felony-drug offense, we affirm this conviction.

### 4. *Possession of a defaced firearm*

For his last sufficiency argument, Jimmerson challenges his felony conviction for possession of a defaced firearm. A person commits the offense of possession of a defaced firearm if he or she knowingly possesses a firearm with a manufacturer's serial number or other identification mark required by law that has been removed, defaced, marred, altered, or destroyed. Ark. Code Ann. § 5-73-107(a) (Supp. 2013). The offense is a Class D felony unless "the manufacturer's serial number or other identification mark required by law is merely covered or obstructed, but still retrievable." Ark. Code Ann. § 5-73-107(c)(1)–(2).

8

In that circumstance, the offense is a Class A misdemeanor. Ark. Code Ann. § 5-73-107(c)(1)–(2).

Jimmerson argues that substantial evidence did not support his felony conviction for possession of a defaced firearm because the serial number on the firearm was retrievable elsewhere on the gun. He claims that this conviction must be modified to a misdemeanor pursuant to Arkansas Code Annotated § 5-73-107(c)(2).

Steve Hargis, a firearm and toolmark examiner with the Arkansas State Crime Laboratory, testified that when he received the firearm, the serial number appeared to be scratched and defaced. Hargis, however, testified that a portion of the firearm's polymer frame could be removed to expose the hidden serial number located underneath. Hargis was able to remove the polymer on the gun at issue to retrieve the metal stamped serial number.

We disagree with Jimmerson's argument that his conviction must be modified to a misdemeanor. It is irrelevant that there was another retrievable serial number. The outer serial number was defaced; it was not "merely covered or obstructed." For that reason and because he admits that he possessed a firearm with a defaced outer serial number, we hold sufficient evidence supports this conviction.

## B. Motion to Suppress

In reviewing the denial of a motion to suppress evidence, we conduct a de novo review. *Akram v. State*, 2018 Ark. App. 504, at 5, 560 S.W.3d 509, 513. We review findings of facts for clear error and determine whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *Id.* A finding is clearly erroneous when, even if

9

there is evidence to support it, the appellate court, after reviewing the entirety of the evidence, is left with a definite and firm conviction that a mistake has been made. *Id*. Specifically, our court reviews a circuit court's denial of a motion to suppress custodial statements on the basis of the totality of the circumstances surrounding the statement, including "the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; statements made by the interrogating officers; and the vulnerability of the defendant." *Id*. (citing *Winters v. State*, 2013 Ark. 193, at 6, 427 S.W.3d 597, 601). We will not reverse a circuit court's ruling on a suppression issue absent a showing that the decision was clearly against the preponderance of the evidence. *Id*.

Before trial, the circuit court held a hearing on the motion to suppress Jimmerson's custodial statement. The officers testified that Jimmerson was very clearly intoxicated when they found him passed out in his car, so they put him in a holding cell and waited for him to sober up to ask him questions. Police arrested Jimmerson sometime between 3 a.m. and 4 a.m. on Christmas Day 2014, and they did not begin to question him until after 7 p.m. that same day. The audio recording of the interview was introduced into evidence at the suppression hearing. Jimmerson initially downplayed his level of intoxication but ultimately admitted having taken multiple Xanax pills and consumed a half pint of brandy.

On appeal, Jimmerson claims that the court erred in finding his custodial statement voluntary. To support his argument, he concedes that he acknowledged his *Miranda* rights,

but he was vulnerable given that he had been detained for so long and was recently removed from a near blackout state.

A statement made while in custody is presumptively involuntary, and the State must prove by a preponderance of the evidence that the defendant made the custodial statement voluntarily, knowingly, and intelligently. *Akram*, 2018 Ark. App. 504, at 6, 560 S.W.3d at 514. In order to determine whether a waiver of *Miranda* rights is voluntary, our court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* When an appellant claims that his or her *Miranda* waiver was rendered involuntary because of drug or alcohol consumption, the level of the appellant's comprehension is a factual matter to be resolved by the circuit court. *Id.* In deciding if a defendant voluntarily waived his or her rights, we determine whether the individual was of sufficient mental capacity to know what the individual was saying—capable of realizing the meaning of his or her statement—and that he or she was not suffering from any hallucinations or delusions.

Here, police waited over fifteen hours after Jimmerson's arrest to conduct the interview, allowing him the necessary time to sober up. During the recorded interview, Jimmerson was read his rights and verbally waived them. He also executed a written waiver. In the video of the interview, Jimmerson appears lucid and is responsive to the questions. *See Harper v. State*, 359 Ark. 142, 155, 194 S.W.3d 730, 738 (2004) (affirming the circuit court's decision to deny motion to suppress when officers testified appellant "did not appear to be intoxicated, that he did not smell of alcohol, that he was steady on his feet, and that he was able to understand and respond to their questions"). Accordingly, the circuit court's

11

decision to deny the motion to suppress was not clearly against the preponderance of the evidence.

## C. Motions for Mistrial

Lastly, Jimmerson argues that the circuit court should have granted his motion for mistrial due to statements made by the prosecutor commenting on Jimmerson's failure to testify. During the State's closing argument, the prosecutor stated:

> Dr. Moneypenny said he can't explain Kendrick Smith's killing. We haven't heard from his statements to Dr. Moneypenny or from his interview with the police, neither of which were under oath, that Markell Jimmerson explained how he shot Kendrick Smith.

> So, I'm anxious to hear in a few moments when defense counsel gives you a closing argument how that is explained because Markell hasn't -- we haven't heard evidence that Markell had explained it to Dr. Moneypenny or to anybody else, and he certainly hasn't explained it to anybody while he's been under oath.

Jimmerson objected, arguing that the prosecutor's comment about his not being under oath was a comment on his failure to testify. The court cautioned the prosecutor to avoid any comment on Jimmerson's decision to testify or not testify. Jimmerson then moved for a mistrial, which the court denied. The court then instructed the jury, "I want to remind you that the Defendant has an absolute constitutional right that he does not have to testify. You are not to consider that he did not testify toward his guilt or innocence in any way."

The prosecutor continued his closing argument stating:

> I totally agree with what the judge just said. This Defendant does not have to stand up here and testify before you. Okay. That is his constitutional right. You should not hold that against him whatsoever.

> But, we've heard a lot of statements made from him -- made from Markell Jimmerson. We've heard his interview. And we've heard statements that he made to Dr. Moneypenny. And it's important to note that he was not placed under oath when he gave those statements.

12

Jimmerson again objected and asked to approach. Upon approaching, the following colloquy took place:

> THE COURT: Don't say it again. Do not say that one more time. I told you you were close. Just avoid it. Period. You are not to comment at all on anything that he did or did not say. Period. Your motion is denied.
>
> MR. JAMES: I ask for another instruction, Your Honor. I don't think this will cure it.
>
> THE COURT: I understand.
>
> MR. JAMES: I mean, it's going to give one, I would ask you to give the one you just gave.

The court then admonished the jury again.

> THE COURT: All right. Ladies and Gentlemen, again, I have already instructed you and I'm reminding you the Defendant has an absolute constitutional right not to testify. You are now to disregard the comments [the prosecutor] has made about what the Defendant may or may not have said to Dr. Moneypenny or during his interrogation at the Forrest City Police Department.

We disagree with Jimmerson's argument that the circuit court should have granted his motion for mistrial.[3] A mistrial is a drastic remedy and should be declared only when there has been an error so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected. *Coger v. State*, 2017 Ark. App. 466, at 11–12, 529 S.W.3d 640, 649. The circuit court has wide discretion in granting or denying a motion for mistrial, and absent an abuse of that discretion, the circuit court's decision will not be disturbed on appeal. *Id.* In these circumstances, any

---

[3]We also disagree with the State's argument that Jimmerson's second request for a mistrial is not preserved for appeal given that Jimmerson had immediately just moved for a mistrial on the basis of the same objectionable closing argument, and the court stated, "Your motion is denied."

prejudice suffered by Jimmerson by the denial of the motion for mistrial was cured by the two admonitions that were given to the jury. An admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice cannot be served by continuing the trial. *Id.* We therefore find no abuse of discretion.

Affirmed.

SWITZER and VAUGHT, JJ., agree.

*James Law Firm*, by: *Michael Kiel Kaiser* and *William O. "Bill" James, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.